**UNITED STATES of America, Plaintiff,**

v.

**LOCAL 359, et al., Defendants.**

**No. 88 Civ. 7351 (TPG).**

United States District Court,
S.D. New York.

Jan. 24, 1989.

Edward Ferguson, U.S. Atty's. Office, S.D.N.Y., New York City, for plaintiff.

J. Kenneth O'Connor, O'Conner & Mangan, P.C., Long Island City, N.Y., for defendants.

## OPINION

GRIESA, District Judge.

This opinion constitutes the court's findings of fact and conclusions of law following the trial of the union defendants in this action.

This action was commenced on October 15, 1987. It is brought under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq. The Government claims organized crime control and RICO violations in the operation of New York's Fulton Fish Market.

The original complaint named several groups of defendants. The first group was the "union defendants"—i.e., Local 359, United Seafood Workers, Smoked Fish and Cannery Union, and certain officers of Local 359. Although there were six officer defendants named in the complaint, and a seventh later named in the amended complaint, the Government withdrew its claim against five of them following trial. The only officer defendants remaining in the action are:

Anthony Cirillo, President

Dennis Faicco, Secretary–Treasurer

The next group of defendants was the union welfare and pension funds—the Fulton Fish Market Welfare Fund and the Fulton Fish Market Pension Fund—and Anthony Cirillo and Dennis Faicco, in their capacities as trustees of those funds. Nina Andrew, Executive Administrator of the funds, was also named as a defendant.

The third group of defendants were the "Genovese Organized Crime Family of La Cosa Nostra" and 29 persons allegedly connected with the Genovese crime family, including Thomas Contaldo (said to be a "capo" of the family), Carmine Romano (allegedly a "made member" of the family) and Carmine Romano's brothers, Vincent and Peter Romano (allegedly "associates" of the Genovese family).

The final defendant named in the complaint was the Fulton Market Employers Association and Associated Purveyors.

The original complaint alleged that the Genovese crime family has controlled the Fulton Fish Market and Local 359 since the 1930's and that commencing in the 1970's, Carmine Romano, an officer of Local 359, acted for the Genovese family in controlling the Market. The complaint alleged that in 1981 Carmine Romano and Peter Romano were convicted of criminal RICO violations and were given prison sentences, and that Local 359 was also convicted under RICO and was fined. The complaint alleged that, despite these criminal convictions, the influence of the Genovese crime family in the Fulton Fish Market continued, and that Vincent Romano succeeded his brother Carmine as the principal Genovese representative in the Market. The complaint contained various allegations of criminal activities by the Genovese family in the Fulton Fish Market—extortion, loan-sharking, gambling and theft.

The complaint alleged that Local 359 is controlled by the Genovese family and that this union "is a vital part" of Genovese control of the Fulton Fish Market, since the union can be used to threaten labor problems. It was also alleged that Anthony Cirillo is merely the "nominal" president of Local 359, and that he was handpicked by the Genovese family for this office. Vincent Romano is said to be the actual head of Local 359.

The complaint requested injunctive relief to prevent further violations of law, and also requested the appointment of a trustee for Local 359 and an administrator for the Fulton Fish Market. The complaint requested election of new Local 359 officers sometime in the future.

### Disposition of Non–Union Defendants

On December 1, 1987 the Government stipulated to dismiss the complaint as to the Welfare Fund, the Pension Fund and Nina Andrew. This stipulation also provided that the claims in the complaint against Anthony Cirillo and Dennis Faicco, in their capacity as trustees of the funds, would be dismissed.

On April 15, 1988 a default judgment was entered against the Genovese Organized Crime Family and against three of the defendants allegedly connected therewith—Thomas Contaldo, Colombo Saggese and Robert Gillio. Under the terms of the default judgment, these defendants are enjoined from having any dealings with Local 359 and from having any business dealings in the Fulton Fish Market or in any commercial seafood business in the Southern District of New York or elsewhere.

On the same day, April 15, 1988, the other 25 individual defendants named as being connected with the Genovese crime family entered into a consent judgment. Under this judgment, defendants Carmine Romano and Vincent Romano are enjoined from having any dealings with Local 359 and from having any business dealings in the Fulton Fish Market. Certain other defendants are enjoined from having dealings with Local 359, but are not prevented from engaging in business in the Market. All defendants are made subject to injunctive provisions forbidding extortion, gambling and loansharking, and also forbidding them from dealing with Local 359 in any illegal manner. The consent judgment provides for the appointment of an administrator for the Fulton Fish Market whose duty it is to ensure compliance with the consent judgment and the default judgment.

The action was dismissed as to the Fulton Market Employers Association and Associated Purveyors by order dated July 6, 1988, consented to by the Government.

*Amended Complaint Against
Union Defendants*

On June 4, 1988 the Government filed an amended complaint. It is directed solely against the union defendants—Local 359 and, as now limited, to two of its officers, Cirillo and Faicco.

Although only the union and certain of its officers are named as defendants in the amended complaint, it basically repeats the lengthy allegations in the original complaint about the control of the Fulton Fish Market by the Genovese crime family and about Genovese criminal activities in the Market. As to the union defendants, the essence of the allegations of racketeering in violation of RICO are the same in the amended complaint as they were in the original complaint—Genovese control of Local 359 and use of the union for criminal activities.

The amended complaint requests, as did the original complaint, that certain officers of Local 359 be removed, that a trustee be appointed for the union and that election of new officers be held sometime in the future. As already indicated, the request for removal of officers has now been limited to Cirillo and Faicco.

The amended complaint alleges various types of criminal activity committed by Cirillo and Faicco, acting in conjunction with the Genovese crime family. The only allegation of crime against the union itself is the claim of illegal receipt of money, in violation of the Taft–Hartley Act, for which the union was convicted in 1981. As the issues are now defined, the Government does not contend that this matter is of any relevance to the question of whether Cirillo and Faicco should be replaced by a trustee and later by newly elected officers. However, the union remains as a defendant in the case because it would be affected by the relief the Government requests against Cirillo and Faicco. Following the trial held August 1–17, 1988 the Government's claims of criminal acts committed by Cirillo and Faicco were refined and limited in the Government's post-trial briefs, in its presentation at the oral argument held August 25, 1988, and in a letter dated September 19, 1988.

*The Issues To Be Decided*

The Government contends that it is entitled to civil RICO remedies under 18 U.S.C. § 1964 as a result of violations of 18 U.S.C. § 1962(c), which provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

The statute provides for a number of possible equitable remedies to prevent and restrain violations of § 1962. It is conceded that removal of Cirillo and Faicco from their union offices would be authorized by the statute if they were found to have violated § 1962 and if such a remedy were necessary to prevent further violations.

A "pattern of racketeering activity," within the meaning of § 1962(c), means at least two "acts of racketeering activity" committed within certain specified periods of time. 18 U.S.C. § 1961(5). An act of racketeering activity is one of the federal or state crimes listed in § 1961(1). The parties concede that, in a civil RICO action, the Government may prevail if it proves the necessary elements by a preponderance of the evidence.

It is agreed that the Fulton Fish Market is an "enterprise" within the meaning of the statute. Moreover, there appears to be no question but that the Genovese crime family was, at least in the past, heavily involved in criminal activity in the Fulton Fish Market, including the use of Local 359 to further the Genovese family's criminal objectives.

However, the union defendants contend that following the criminal convictions of 1981, the union was effectively purged of Genovese control and influence. The union's International established a trusteeship of Local 359 which lasted from 1981 until 1983. A new slate of officers headed by Anthony Cirillo was elected in 1983 with the concurrence of the International. Faic-

co came to the union thereafter, first as an employee and then as an officer.

The union defendants concede that Vincent Romano was involved in the Fulton Fish Market following the conviction of his brother Carmine in 1981. They concede that this involvement lasted until the time of the present litigation. Moreover, they have not attempted to rebut the Government's evidence that Vincent Romano was connected to the Genovese crime family, particularly through a close association with one of the leaders of the family, Thomas Contaldo; that Vincent Romano was involved in certain criminal activities in the Fulton Fish Market; and that these activities occurred at various times subsequent to the 1981 criminal convictions of Carmine and Peter Romano. However, the union defendants contend that any crimes of Vincent Romano, at least in recent years, were carried on outside the union and did not involve collaboration with Local 359 or its officers.

It is appropriate at this point to emphasize one overriding factor. The essential theme of the Government's case against the union defendants is that the union is controlled by the Genovese crime family and that the various crimes committed by Cirillo and Faicco resulted from Genovese control. This alleged control is the essential nexus which is said to make the crimes a "pattern of racketeering activity" in violation of RICO, rather than several separate, independent criminal acts. The Government's case is not built upon the theory of crimes committed by Cirillo and Faicco as independent individuals. The essential element of the Government's case is that the union and these two officers are tools of the Genovese crime family. The Government seeks to have Cirillo and Faicco removed in order to end Genovese control over the union.

The Government's allegations of criminal conduct—acts of racketeering—on the part of Cirillo and Faicco, as specified in its post-trial submissions, are as follows:

1. *Wire Fraud in 1985 Contract Negotiations.* The Government alleges that Cirillo and representatives of the Genovese family carried out a wire fraud scheme to defraud the membership of Local 359 of money and property in connection with the negotiation of the 1985 collective bargaining agreement. According to the Government, the scheme resulted in the following:

(a) The right to strike was relinquished and an inadequate wage increase was agreed to.

(b) A concession was made by the union to a class of employers called "purveyors," which included Intercity Fish, a company owned by a relative of Vincent Romano.

(c) Confidential information about the negotiations (which information is, in the Government's view, property) was conveyed by Cirillo to Vincent Romano.

2. *Wire Fraud in Aiding Steve Melfi.* The Government alleges a second wire fraud scheme in which Cirillo is said to have assisted Carmine Romano's son-in-law, Steve Melfi, to obtain a job at the Fulton Fish Market. It is the Government's theory that Cirillo had a fiduciary duty to fairly and impartially assist the members of Local 359 in obtaining jobs and that he violated this duty in giving assistance to Melfi.

3. *Taft–Hartley Act Violations.* The Government alleges that out of the union membership of 600, there are 20 who are owners, managers or supervisors of seafood businesses. The same problem appears to have existed with one or two other persons in the recent past. It is said that the receipt of dues by the union from these persons violates 29 U.S.C. § 186(b)(1), which makes it unlawful for a union to receive payments from an employer or any person who acts in the interest of an employer.

4. *Extortion of Employers.* The Government alleges that on certain occasions Cirillo and Faicco extorted payments of money from employers for the union.

(a) It is alleged that Faicco committed extortion in connection with obtaining union memberships at Ocean of Europe Seafood, Ideal Fish and Seafood and Tsukiji Seafood. It is alleged that Cirillo participated in the extortion of Tsukiji.

(b) It is alleged that Cirillo extorted payments from Americana Transport, a company which hauled fish from Maine to the Fulton Fish Market.

The Government contends that these instances of extortion also involved Taft–Hartley violations—*i.e.*, improper payments by employers to a union or an officer thereof.

### Findings and Conclusions
### The Fulton Fish Market

The Fulton Fish Market is located on the lower east side of Manhattan near the Brooklyn Bridge. It is a wholesale market. There are 70 to 80 wholesale businesses, most of them consisting of the owner or owners and three or four employees. There are other businesses in the Market mainly designed to serve the wholesalers and their employees, such as an ice business, small trucking companies and eating places.

The Market operates almost entirely at night—from about 10:00 p.m. to 8:00 a.m. The Market is open five nights a week—Sunday night/Monday morning through Thursday night/Friday morning.

Fish are brought to the Market from all parts of the United States and from Canada, and indeed from foreign points such as Norway, South America and the Orient. Fish from Long Island, New England and other points on the Atlantic and Gulf coasts are trucked directly to the market. Fish from distant places are flown into Kennedy Airport and trucked from there to the Market.

The total sales volume in the Market amounts to several hundred million dollars per year. More precise figures are not available. It appears that the quantity of fish handled in the Fulton Fish Market has declined somewhat over recent years, although one wholesaler testified at the trial that the quantity is now stabilized. The price of fish has risen sharply in recent times contributing to a high dollar volume in the Market.

The first phase of the nightly market operation is the arrival of the trucks bringing in the fish to be distributed to the wholesalers. These trucks proceed to certain "unloading zones." These zones are not owned by any entity in the Market, but are simply city streets which are largely unused at night except for the purposes of the Market. There are unloading crews which take the boxes of fish (100–125 lbs.) off the trucks. Employers of the wholesalers, known as journeymen, then put the boxes onto handcarts and take them to the premises of the wholesalers, where the fish is set out for sale. Sometime after midnight the buyers begin to arrive—fish retailers and restaurant operators. They usually arrive in vans or small trucks and proceed to "loading zones." Again, these zones are not owned by anyone in the Market, but are city streets, including some of the roadway under the elevated East Side Drive. The retailers and restaurant operators will leave their vehicles in the loading zones and make the rounds of the wholesalers. When they make purchases of fish, it is often the case that some of their purchases will be taken to their vehicles while they are making other purchases in the Market. Members of "loading crews" will put the fish into the vehicles and keep a watch until the owners come back and drive away.

The incoming truckers pay a fee to the unloading crews. The retailers and restaurant operators pay a fee to the loading crews.

The author of this opinion has visited the Market during its active hours in the middle of the night. It is difficult to overstate the tremendous amount of fast-paced hard work which goes on in the Market—the movement of hand trucks with 400–500 pounds of fish from the incoming trucks to precise locations among the 70–80 wholesalers; the bargaining activity between the wholesalers and hundreds of retailers and restaurant operators; the delivery of the fish to the vans and trucks of the purchasers.

### The Union

Local 359 has a membership of about 600 persons, about 450 of whom work in the Fulton Fish Market. Some of the members

are employed in other locations in New York City, and in New Jersey. The decline in the volume of fish in the Market in recent years has led to a decline in the number of jobs available and also a decline in union membership.

At the present time, the dues of union members are $26 per month and are usually deducted from the paychecks. The initiation fee for new members is $150. Contributions to the pension and welfare funds are made by the employers at the rate of $94 per week for each employee who is a union member.

Not all the workers in the Market who are eligible for union membership are in fact members. For instance, the unloading crews and the loading crews have never been unionized, and some employees of wholesalers are not.

It appears well established that the Genovese crime family was at one time in control of Local 359. Carmine Romano, a "made member" of the Genovese family, was the chief executive officer of Local 359 from 1974 to 1980. He was succeeded in this capacity by his brother, Peter Romano, who served until the time of the criminal convictions of himself and Carmine Romano in 1981, at which time the International established a trusteeship for Local 359. Both these Romanos went to prison. Peter has been released. Carmine is still in prison but will be released shortly. The trusteeship of Local 359 functioned from August 21, 1981 until December 1, 1983.

### Cirillo and Faicco

Anthony Cirillo started working in the Fulton Fish Market in 1972. He spent about 6 years working as a journeyman and about another 4 years as a salesman. He joined Local 359 shortly after he started working in the Market. He became a member of the board of the union in 1980. In 1982, while the union was under the trusteeship, Cirillo was appointed business agent. Cirillo was elected president of Local 359 in October 1983, a position he still holds. This is his full-time employment. He holds no other job in the Market or elsewhere. A major function of Cirillo as union president is to help members obtain work. Each night some union members will "shape up"—i.e., seek employment in the Market for that night. Cirillo helps place these men and also helps members in finding more permanent employment. Cirillo takes various steps to protect the safety of the employees in the Market. He watches out for unsafe conditions and seeks to have them remedied. Cirillo is also responsible for collecting delinquent dues and pension and welfare contributions. Cirillo exercises some supervision over Faicco, and also supervises the two office employees at the union who process claims against the pension and welfare funds. Cirillo's salary is about $32,000 per year.

Dennis Faicco has never had any other employment in the Market except with the union. He started in June 1984 as business representative. He was appointed by the board to be secretary-treasurer in September 1985 and was elected to that office, which he still holds, in September 1986. His main duties are organizing—i.e., obtaining new members—and handling grievances. His work day for the union is from about 6:00 a.m. until noon. His salary is about $30,000 per year. He has a second job as groundskeeper for the Town of Hempstead. His hours on that job are 1:00 p.m. to 7:00 p.m.

### Operation Seaprobe

Commencing in October 1984 there was an investigation of the Fulton Fish Market conducted jointly by the FBI and the New York City Police Department. This investigation was called "Operation Seaprobe." The investigation is still going on to some extent, although apparently the most active phase was concluded in the fall of 1987. Until that time Operation Seaprobe regularly employed a staff of 24 law enforcement officers—12 FBI agents and 12 New York City policemen.

The investigation included surveillances in the Market and also in Brooklyn, Queens and Staten Island. One of the reasons for the surveillances outside the Market was to determine whether persons involved in the Market were meeting organized crime figures elsewhere. The investigation also in-

volved a number of court-ordered telephone wiretaps. In addition, there were numerous interviews. As to interviews directed at the union, these focused mainly on retired members. There was little or no attempt to interview active members.

Certain aspects of the investigative results as to the union and its officers should be noted here, particularly in view of the Government's repeated allegations that the Genovese family, through its control of the union and through the threat of labor problems, has been able to dominate the entire Fulton Fish Market.

John Marley, the Government's principal witness regarding Operation Seaprobe, has testified that the investigation uncovered no evidence of work stoppages or threats of work stoppages in the Fulton Fish Market during the time of the Seaprobe investigation. Neither Cirillo nor Faicco was ever observed committing any illegal act. Although certain telephone wiretaps were used, apparently none was placed upon the telephone of Cirillo or the telephone of Faicco. At least no evidence of such wiretaps was introduced at the trial.

The alleged instrument of Genovese control of Local 359 during the time of the Seaprobe investigation was Vincent Romano. There is a substantial amount of evidence of contacts between Romano and the Genovese family capo Thomas Contaldo, mostly outside the Market. Prior to the time of the consent judgment of April 1988, Romano was frequently present in the Market and also continually in communication with various persons in the Market. The Seaprobe investigation uncovered evidence that Romano was involved in criminal activity in the Market at the behest of the Genovese family, including some extortion of wholesalers. However, the evidence indicates that the degree of criminality in the Fulton Fish Market following the 1981 convictions of Carmine and Peter Romano has been considerably less than it was prior to 1981. As to criminal activity by Vincent Romano involving the union, even the Government's claims are of a limited nature. These claims will be dealt with hereafter.

The Government introduced photographs showing meetings of Vincent Romano with Contaldo and two of Contaldo's subordinates, Alfonso Malangone and Gerard Guadagno. There is no evidence of any contact by Cirillo or Faicco with Contaldo, Malangone or Guadagno either inside or outside the Market.

As far as Vincent Romano's communications with Cirillo are concerned, Romano's telephone was tapped for about one year, from August 1985 to July 1986. He placed calls on a daily basis to the public telephone at Carmine's Bar and Grill, a popular eating place in the Market, and asked for various people in the Market. In none of these calls did he ever ask for Cirillo. The only recorded telephone conversations between Vincent Romano and Cirillo occurred in late 1985, at the time of collective bargaining negotiations involving Local 359. These are the subject of a claim by the Government which will be discussed hereafter.

During Operation Seaprobe, Vincent Romano and Cirillo were observed talking about 100 times in or near Carmine's Bar and Grill. These 100 occasions occurred over a period of about three years. There is no evidence of what was said in these conversations. There is no specific evidence connecting any of these conversations with any illegal activities. Nothing was ever observed being passed between the two men in any of these meetings.

*Wire Fraud Claim—1985 Contract Negotiations*

The Government contends that Cirillo committed acts of racketeering consisting of wire fraud in violation of 18 U.S.C. § 1343. The statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of exe-

cuting such scheme or artifice, shall be [guilty of a crime].

As already described, the Government claims wire fraud in connection with the 1985 collective bargaining negotiations involving Local 359. The Government contends that Cirillo and Genovese family representatives engaged in a scheme to defraud the union, and that the union (1) relinquished the right to strike and obtained an inadequate wage increase; (2) made a concession to a class of employers called "purveyors," which benefited the family of Vincent Romano; and (3) betrayed confidential information. The Government contends that the fraud was perpetrated by concealing the above activities from the union membership. The Government relies upon certain telephone calls to bring the alleged scheme within the wire fraud statute.

The three-year collective bargaining contract between Local 359 and the employers, most of whom were represented by the Fulton Market Employers Association and Associated Purveyors, expired November 30, 1985.

Negotiations for a new contract took place in the fall of 1985 and were not concluded until almost the deadline—midnight November 30. At that time a new contract was agreed upon and was subsequently ratified by the union.

█ It is nothing short of astonishing that the Government would claim that the union settled for an inadequate wage increase—"ridiculously low" as the Government put it at the oral argument. The Government, in its case, introduced no testimony whatever about the course of the negotiations regarding wages. The Government introduced no evidence directed in any way toward the proposition that the wages under the new collective bargaining agreement were less than they should have been had the bargaining been conducted by the union representatives in some different manner.

In the defense case, Cirillo testified that he had a goal of reaching $500 per week for the largest class of employees in the Market, the journeymen, and that he achieved that goal. The new collective bargaining agreement provided that journeymen would be paid $500 per week the first year of the contract, $520 the second year, and $542.50 the third year. This compared with the wages for journeymen under the previous contract—$432.52 for the first year, $452.52 for the second year, and $477.52 for the third year ending November 30, 1985. There is no basis for the claim that the wage rates achieved in the 1985 contract were somehow a fraud on the union membership.

█ The next issue to be dealt with is the claim that Cirillo and the Genovese family defrauded the union membership in the 1985 collective bargaining negotiations by having the union make a concession to a class of employers called "purveyors." This claim refers to Article IX, section 2 of the December 1, 1985 collective bargaining agreement. The provision was as follows:

Sec. 2. Effective December 1, 1985, new employees of purveyors may be paid a probationary rate as follows:

| start | 50% of scale |
| after 6 months | 70% of scale |
| after 12 months | 80% of scale |
| after 18 months | 100% of scale |

The probationary rate shall not apply to those extras employed by the purveyor for six (6) months as of December 1, 1985 or employed by the purveyor for 10 or more days in the month of November, 1985.

Thus, new employees of purveyors were not paid the full wages of the employees of wholesalers, but were paid a percentage of those wages on a sliding scale for the first 18 months of their employment.

A purveyor is generally a dealer who cuts the fillets out of the fish and sells the fillets to restaurants. A wholesaler usually sells the whole fish or, in the case of a variety such as swordfish, large sections.

The collective bargaining agreement which expired November 30, 1985 contained no provision for the reduction of wages of new employees of purveyors. This provision was inserted for the first

time in the agreement which became effective December 1, 1985.

The Government contends that Cirillo made this concession to the purveyors at the behest of Vincent Romano, whose brother-in-law owned a purveying company, Intercity Fish.

The facts are otherwise. The reason that the purveyor matter came up in the 1985 negotiations was that the purveyors learned that there was a wage concession contained in the separate collective bargaining agreement which Local 359 had with a purveyor, M. Slavin & Son. The other purveyors, represented by the Employers Association, insisted upon their right to have equal treatment under the "most favored nation" clause, which was routinely contained in the collective bargaining agreements over the years.

The union at first resisted the Employers Association on this point, declining even to produce the Slavin agreement. The Association demanded arbitration, which resulted in a ruling on November 22, 1985 that the Slavin agreement should be produced to the Association.

Thereafter it followed virtually as a matter of course that the provision regarding new employers of purveyors was inserted in the 1985 collective bargaining agreement pursuant to the most favored nation principle.

It is true that Vincent Romano's brother-in-law owned a purveying company, Intercity Fish, which was a member of the Employers Association. It is further true that Intercity Fish benefited from the provision for new employees of purveyors which was included in the 1985 collective bargaining agreement. However, there were at least four other purveyors in the Association. The spokesman for the purveyors in the negotiations was Robert Smith. He testified at the trial and denied any scheme instigated by Vincent Romano. The court credits this testimony. There is no basis for believing that Smith, Cirillo or any of the negotiators were acting at the behest of Vincent Romano in dealing with the provision regarding purveyors.

The Government contends, however, that Vincent Romano's control over the negotiations was evidenced by certain recorded telephone conversations. The Government goes so far as to contend that Vincent Romano was "dictating the outcome of the negotiations" (Transcript of August 25, 1988, p. 1528).

In considering these telephone conversations, it should be recalled that negotiations on the new collective bargaining agreement were taking place until virtually the final hour, midnight November 30, 1985.

Recorded telephone conversations occurred between Vincent Romano and Anthony Cirillo on the afternoon of November 28; the evening of November 29; the afternoon of November 30; and at 1:18 a.m. December 1, shortly after the new contract was agreed upon.

Vincent Romano had a telephone conversation with Vincent Tattick, a member of the employers' negotiating committee, on the morning of November 30.

Vincent Romano had telephone conversations with Gerard Guadagno, the driver for Thomas Contaldo of the Genovese family, on the afternoon of November 29 and twice on the afternoon of November 30.

It is obvious that Vincent Romano was interested in learning about the course of the collective bargaining negotiations and in learning about whether a contract was arrived at. Romano was about to become the owner of a trucking company in the Market. Although the trucking company was not unionized and did not have a direct stake in the Local 359 negotiations, it had an indirect interest since its business depended upon the functioning of the Market. It is also clear that Vincent Romano was passing on information regarding these subjects to the Genovese family via his conversations with Guadagno.

It is now necessary to summarize the relevant portions of the recorded telephone conversations to determine if they indicate, as claimed by the Government, that Romano controlled the 1985 collective bargaining negotiations.

In the conversation between Cirillo and Vincent Romano the afternoon of November 28, Cirillo remarked that "They're still holding onto that ah, to that two-tier thing." In his trial testimony Cirillo explained that the employers were constantly trying to get a two-tier wage scale involving different wages for new hires. This apparently was something that went substantially beyond what was involved in the concession to the purveyors. In the November 28 telephone conversation Romano replied that he thought that the employers were using the two-tier demand as a wedge to try to knock other terms down. Romano told Cirillo that he should tell the employers tomorrow to forget about the two-tier thing. Cirillo responded that he had already told the employers that.

The two-tier approach was not adopted as part of the contract. There is no evidence that the discussion between Cirillo and Romano on November 28 had any influence on the outcome regarding that point.

Romano spoke to Guadagno the afternoon of November 29. Neither Romano nor Guadagno testified at the trial to explain this conversation. What the transcript shows is that Guadagno had been waiting for a call from Romano. Romano agreed to give Guadagno word about the negotiations that night. Guadagno said something about having "those guys standing by." Romano stated:

No, no, it don't look like it's gonna be tomorrow, but we, I won't know 'till like 5:30, six o'clock.

The Government contends that Guadagno's reference to having "those guys standing by" relates to the fact that the Genovese family intended to break a strike if one occurred. However, this meaning is not necessarily suggested by the conversation itself and there is certainly no other evidence to support the idea of a plan to break a strike.

Romano called Cirillo the evening of November 29. Cirillo stated that no agreement had been reached, that a meeting was scheduled for the next day, and that "these guys go to the eleventh hour." Cirillo then made the following comment:

Ah, I threw in a few concessions, ah, that ah, you know, ah, you know, you know, with the mob, ah, ah, um, just let me leave it that ah, ah, we didn't come to an agreement and I'll call you in the morning.

Cirillo did not tell Romano what the concessions were. At the trial Cirillo was asked what was meant by "the mob." He denied that he was referring to organized crime and stated that he was referring to the men in the Market. Then he stated that he believed that Romano was relaying information to truckers in New Bedford and that maybe "the mob" referred to these truckers.

Cirillo's testimony on this point was evasive. On the other hand, the reference to "the mob" is so fragmentary and cryptic that, despite the common association of the phrase "the mob" with organized crime, it cannot be determined exactly what is being referred to in this conversation.

It should be said at this point that one must assume that Cirillo knew the facts of life—i.e., knew that Vincent Romano had associations with the Genovese crime family. Moreover, it is certainly true, as the court stated emphatically at the trial, that, as a matter of good judgment, Cirillo should not have been in touch with Romano about union matters. On the other hand, it is a foundational principle of our law that there is no "guilt by association". The Government's claim that Cirillo participated in a scheme to have the negotiations carried out at the behest of, and for the advantage of, the Genovese family is not proved by the mere fact of conversations between Cirillo and Romano, including one isolated reference to "the mob." There must be proof of the Genovese family dictating or directing or at least influencing Cirillo in the negotiations. It is fair to say that, at least through the time of the conversation held on the evening of November 29, there is no proof that this was occurring.

Vincent Romano called Vincent Tattick of the employers' negotiating group early in the morning of November 30. Romano

wanted to know what was happening in the negotiations. Tattick replied that they would try again that day. There was no discussion of any particular issues and Tattick was entirely noncommittal on what he thought the prospects were for an agreement. The essence of what he communicated to Romano was contained in the remark, "So let's see what happens."

Romano called Guadagno later in the afternoon of November 30 to say that the negotiators were still tied up in talks.

Guadagno called Romano shortly thereafter, saying, "We got those guys standing by." Romano said that he would know tomorrow one way or the other and that "the most they're gonna do is maybe get a 24-hour extension."

Again, the Government argues that this conversation represents a plan to use "those guys" to break a strike if one occurred. However, the evidence is not sufficient to support such a claim.

At about midnight November 30 an agreement was reached between the union and the employers. The first person notified by Cirillo was Vincent Romano. Cirillo telephoned Romano at 1:18 a.m. December 1. Cirillo stated in substance that a contract had been arrived at, except for M. Slavin & Sons, who negotiated separately. Romano asked what the settlement was and Cirillo replied that, "we hit it right on the head." Cirillo added that it was a good medical package. He stated that there had been a few concessions for new hires for the purveyors. Romano stated:

Yeah, now, in other words, it's okay, they can start shipping in.

Cirillo replied in the affirmative.

On December 2 Vincent Romano called Phyllis Canino. She was Romano's sister and was also the wife of Michael Canino, a co-owner of Intercity Fish, the seafood purveyor referred to earlier in this opinion. Romano and Phyllis Canino expressed satisfaction at the purveyor concession obtained by the purveyors. However, as already described, there is no evidence that Romano had any abnormal role in obtaining that concession.

To return to the recorded conversations between Cirillo and Romano, it is important to understand what they do *not* show. Except for the rather minor point about the two-tier issue, these recorded conversations do not show that Romano gave any instructions or directions to Cirillo as to what he should or should not do in the negotiations. They do not provide proof that Romano was controlling the negotiations or that Cirillo was acting at the behest of Romano.

■ This brings us to the final wire fraud claim relating to the 1985 negotiations—*i.e.*, that confidential information, alleged by the Government to be property, was conveyed by Cirillo to Romano. This claim is without merit.

The Government has given no precise definition of what it means by "confidential information." However, it is certainly true that there are matters connected with labor negotiations which should be held in confidence by a negotiator such as Cirillo. Certainly, advance notice of union negotiating strategies should not be disclosed to the employers or to outsiders. Also, it might well be improper for a negotiator to predict the probable outcome of the negotiations to outsiders who could take advantage of this information in some way.

Cirillo had no discussion with Romano about negotiating strategies he planned to use. Cirillo made no attempt to give Romano any prediction about the outcome of the negotiations or about whether there would or would not be a strike. The Government has not shown that Cirillo conveyed confidential information to Romano.

*Wire Fraud Claim—Aiding Steve Melfi*

■ The Government contends that Cirillo was party to another wire fraud scheme in assisting Carmine Romano's son-in-law, Steve Melfi, to obtain a job at the Fulton Fish Market. The Government notes the statutory fiduciary duty Cirillo had to the union and its membership under 29 U.S.C. § 501(a) and asserts that Cirillo violated this duty by assisting Melfi, not then a union member, at a time when the union men were having difficulty obtaining jobs.

The Government relies upon certain recorded telephone conversations as evidence of this alleged crime on the part of Cirillo. There is no merit to the Government's claim.

It is true that Steve Melfi was the son-in-law of Carmine Romano, who was in prison at the time in question. In March 1986 Carmine Romano telephoned Vincent Romano from prison and asked Vincent to help Melfi find a position in the Market. Carmine suggested that Vincent should talk to Cirillo, who might help. During the next few days there were two other recorded conversations between Carmine Romano and Vincent Romano and a recorded conversation between Vincent Romano and Melfi. Apparently Vincent assisted Melfi in getting a job. However, there is no evidence that Cirillo played any role whatever in obtaining the job for Melfi. After Carmine had suggested that Vincent talk to Cirillo, all that is said about Cirillo is that Cirillo "come down late," and that Melfi was at some point waiting around and talking to Cirillo. These references are not explained in the evidence and do not add up to proof of a crime committed by Cirillo.

*Taft–Hartley Act Claim*

It was established at the trial that 20 of the members of Local 359 are owners, managers or supervisors of seafood businesses. The same situation appears to have existed for one or two other persons in the recent past.

The Government contends that Cirillo and Faicco are guilty of criminal violations of the Taft–Hartley Act by virtue of the union's receipt of dues from these owners, managers and supervisors.

Several statutory provisions are relevant. We start with 29 U.S.C. § 186(a)(2), which provides:

> (a) It shall be unlawful for any employer ... or any person who ... acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
>
> .    .    .    .    .

> (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce;....

Thus, it is unlawful for any employer or any person who acts in the interest of an employer to make a payment of money to any labor organization or to an officer thereof, where that labor organization represents the employees of such employer. A subsequent statutory section makes it unlawful for a union or a union officer to receive a payment made in violation of § 186(a)(2). This is the effect of § 186(b)(1), which provides:

> (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

The term "employer" is defined in § 152(2), although the definition is not particularly helpful on any issue in the present case. Of more interest is the definition of "employee" in § 152(3), which provides that this term does not include "any individual employed as a supervisor." The term "supervisor" is defined in § 152(11) as follows:

> (11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

In arguing the distinction between supervisors and other employees, the Government points to the definition of "bargaining unit" contained in the Local 359 collective bargaining agreements. This definition is contained in Article I, Section 1, which provides:

> *Bargaining Unit.* This agreement sets forth the wages, hours and terms and

conditions of employment of all present and future employees of the Wholesale Fish Industry, Fish Purveyor Industry, and Fish Filet Industry, employed by the Employer during the term of this agreement ("Employees"), except that it shall not apply to executives, office and clerical employees and/or any supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees or effectively recommend such action.

The Government argues, on the basis of all of these statutory provisions, that it was a criminal violation of the Taft-Hartley Act for the union to accept dues from any owners of seafood businesses and also from any managers or supervisors employed in these businesses. Prior to 1984, the relevant criminal penalty provision, 29 U.S.C. § 186(d), read:

> (d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

In 1984 the provision was amended to deal with payments made to unions by way of dues or contributions to a benefit fund, or other types of payments not relevant here, where any of these payments were not made in accordance with certain detailed rules set forth in § 186(c). The new § 186(d) contains an initial paragraph providing that, with respect to payments of the kind referred to in subsection (c) and in violation of that subsection,

> (1) Any person who participates in a transaction involving a payment ... to a labor organization [contrary to the provisions of subsection (c) ] and willfully and with intent to benefit himself or to benefit other persons he knows are not permitted to receive a payment [under subsection (c) ], shall, upon conviction thereof, be guilty of a felony and be subject to a fine of not more than $15,000, or imprisoned for not more than five years, or both; but if the value of the amount of money or thing of value involved in any violation of the provisions of this section

does not exceed $1,000, such person shall be guilty of a misdemeanor and be subject to a fine of not more than $10,000, or imprisoned for not more than one year, or both.

The second paragraph of the amended § 186(d) provides:

> (2) Except for violations involving transactions covered by subsection (d)(1) of this section, any person who willfully violates this section shall, upon conviction thereof, be guilty of a felony and be subject to a fine of not more than $15,000, or imprisoned for not more than five years, or both; but if the value of the amount of money or thing of value involved in any violation of the provisions of this section does not exceed $1,000, such person shall be guilty of a misdemeanor and be subject to a fine of not more than $10,000, or imprisoned for not more than one year, or both.

The Government has offered no very precise analysis of which criminal provision is applicable. However, on the issue of when the alleged violations occurred, the evidence presented by the Government related to a membership list as of the time of the trial in 1988, and the Government appears to make no argument against applying the post-1984 criminal penalty provisions. Moreover, the category of Taft-Hartley violations claimed by the Government—*i.e.*, payment of dues, including contributions to benefit funds—would seem to fall within subsections (c) and (d)(1), so that the Government would need to prove that Cirillo and Faicco acted willfully and with intent to benefit themselves or other persons they know are not permitted to receive the payment.

Cirillo and Faicco argue that the Government has failed to prove any criminal violation of the Taft-Hartley Act. They point to various parts of the statute as favoring their position. Specifically, they cite 29 U.S.C. § 164(a), which provides that nothing in the statute "shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization." Defendants note that Arti-

cle IV, Section C of the union By-laws provides that an owner-operator may be a nonactive member of the union. They also assert that, to the extent that the payments are made to benefit funds, they are legal under § 186(c)(5), which provides that the prohibitions of other portions of § 186 shall not be applicable with respect to money paid to a trust fund established by a union for the benefit of the employees.

Cirillo and Faicco contend that the Government's accusation of criminal conduct not only ignores relevant statutory provisions but flies in the face of the realities of the Market. They cite the uncontradicted evidence showing that people involved in the Market frequently move up and down between low level positions and management or ownership, and that people in ownership and managerial positions often do much the same manual labor as the lower level employees. Cirillo and Faicco argue that people who move in and out of these ownership and managerial positions often seek to obtain and retain union membership largely for the purpose of providing for themselves and their families the medical and other benefits accruing from membership. Defendants contend that these circumstances do not involve any Taft-Hartley violations at all, and, in any event involve only technical violations without the *mens rea* making such violations criminal.

The Government urges that defendants are misinterpreting the statutory provisions they rely upon. With respect to § 164(a), the Government states that this provision is not applicable to supervisors in the Fulton Fish Market because they are not part of the bargaining unit, as defined by the collective bargaining agreement. As to § 186(c)(5), the Government urges that the statute only allows contributions to be made to benefit funds on behalf of employees. The Government also notes that the provision in § 186(c) dealing with dues—subdivision 4—provides that payments may be made with respect to money deducted from the wages of employees for the purpose of paying union dues.

In ruling on the Government's claim, it must be acknowledged that the various issues of statutory interpretation, and the application of the statutory provisions to the facts of this case, involve a number of very doubtful points. However, one thing is *not* doubtful. It is perfectly clear that the presence of the 22 persons in question on the rolls of Local 359 had nothing whatever to do with organized crime or the Genovese crime family. Even if it was a violation of the Taft-Hartley Act to carry these persons as union members and to collect dues and pension and welfare contributions from them, there is no showing that this was anything other than a technical violation, the degree of fault being negligence at most. The Government has made no showing that either Cirillo or Faicco acted willfully and "with intent to benefit himself or to benefit other persons he knows are not permitted to receive a payment." Thus, the Government has failed to make its case of criminal Taft-Hartley violations.

Certainly the situation shown here does not provide any basis for the remedy of ousting Cirillo and Faicco from their union offices. If there is some correction to be made in union practices with regard to membership of owners, managers or supervisors, this can be done by the union in consultation with its attorney.

*Extortion Claims*

One of the principal devices of organized crime is extortion. In a RICO case charging organized crime control of the Fulton Fish Market, one would expect to see serious extortion allegations. This is exactly what occurred in the Government's pleadings here.

The amended complaint alleges that the Genovese family has been able to control the Fulton Fish Market by means of various racketeering acts, including extortion of the businesses in the Market (par. 45). It is further alleged (par. 46):

Through threats of labor problems, the Genovese family has dominated the Fulton Fish Market and profited illegally from its operations.

The amended complaint alleges that Genovese family control of the Market, and also of Local 359, is exercised through Vincent Romano and that (par. 55):

> Vincent Romano's control of Local 359 has allowed him and his associates to intimidate wholesalers with the threat of strikes and other labor disruptions.

The amended complaint goes on to allege (par. 56) that Cirillo and Faicco, "together with and/or aided and abetted by the Genovese Family" and the defendants connected therewith, obtained "direct payoffs" from the various companies in the Market, which payoffs were

> ... induced by the wrongful use of actual and threatened force, violence and fear, including fear of physical and economic injury.... Defendants Anthony Cirillo and Dennis Faicco have each committed or aided and abetted two or more of these acts of extortion.

Thus, the amended complaint gave promise of a full-scale case against the union defendants, including evidence of threatened labor disturbances, regular payoffs from businesses in the Market, and the channeling of extortion proceeds into the hands of the Genovese family.

No such case was made out in court. As already described, FBI Agent Marley testified that the Seaprobe investigation, which commenced in October 1984, uncovered no evidence of work stoppages or threats of work stoppages. There was no evidence of any system of collecting money from businesses in the Market by threats of labor problems. There was no evidence of Cirillo or Faicco acting in any way to assist in obtaining payoffs for the benefit of Vincent Romano or the Genovese family.

The Government *did* attempt to prove a case of extortion against Cirillo and Faicco, but it was a case which bore little resemblance to the aggravated charges in the pleadings. The Government sought to prove that Cirillo and Faicco committed extortion in connection with organizing efforts at three companies—Ocean of Europe Seafood, Ideal Fish and Seafood and Tsukiji Seafood. It is further alleged that Cirillo extorted payments from a trucker by the name of Americana Transport. The court will now deal with these claims.

The relevant statute is the Hobbs Act, 18 U.S.C. § 1951, which, among other things, makes it a crime to obstruct commerce by means of extortion. The term "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2).

The Government contends that the alleged instances of extortion also involved Taft–Hartley violations—*i.e.*, improper payments by employers to the union or to Cirillo.

### a. *Ocean of Europe*

■ Ocean of Europe Seafood, Inc. is owned by Antonio Cunha and is located in Newark and Belleville, New Jersey. It does both a wholesale and retail business and buys from the Fulton Fish Market. In 1985 it had about 15 employees. The record is not clear as to how many were involved in the wholesale phase and how many in the retail phase.

Cunha testified that in 1985 Faicco approached him and said that "a lot of the major distributors out in New Jersey were joining the union" and that Faicco would like to have Cunha's company in the union also. Both Cunha and Faicco testified that Cunha complained that he could not afford to have all his employees join the union, obviously referring to the fact that the company would need to make pension and welfare fund contributions. Ocean entered into a collective bargaining agreement with the union, but with only three persons joining, and one of these was Cunha. The company paid the initiation fee for all three, a total of about $600, and thereafter the company paid the dues on behalf of the three persons amounting to about $78 per month. The record is not clear regarding pension and welfare contributions.

The two employees other than Cunha left Ocean about a year before the trial. They were not removed as union members at that time. This matter was corrected during the trial.

Faicco testified that he understood that if a company was incorporated and if the "boss" did the work of an employee, he could be a union member. Ocean of Europe was incorporated, and Faicco testified that Cunha drove a truck into the Market and thus did some work of an employee.

There is no evidence that Faicco used threats, force or violence, or otherwise sought to induce fear in Cunha. There is no showing that any of the payments by Ocean went to Faicco or Cirillo personally, or to Vincent Romano or the Genovese family. The payments went to the union and also possibly to the benefit funds. It should be noted that the Government makes no claim in this case about a misapplication of the monies in the union treasury or in the benefit funds.

Although the Government has introduced no evidence of threats, force or violence directed by Faicco against Cunha, the Government contends that the element of extortionate fear was present because Cunha, at the time of the negotiations, was aware that Fulton Lobster Company had been approached by representatives of Local 359 to unionize the employees and that there were negotiations with Fulton Lobster Company. Cunha testified that he had been told by Fulton that it was not going to have its employees in the union and that it was not going to send trucks into the Market anymore. Cunha testified that, before withdrawing from the Market, Fulton was having trouble getting its fish into the Market.

No witness from Fulton Lobster Company testified at the trial.

Faicco testified that Fulton Lobster Company was a purveyor in Newark which he tried to organize in 1984, that he talked to the employees and gave them literature, and that he received indications of interest from a couple of employees, one of whom was discharged. No collective bargaining agreement was reached with Fulton Lobster Company.

The court rules that the evidence, including that relating to Fulton Lobster Company, does not provide a basis for holding Faicco or Cirillo guilty of extortion in respect to the Cunha matter.

b. *Ideal Fish and Seafood*

■ Ideal Fish and Seafood Company is a corporation doing both a wholesale and retail business in Newark, New Jersey. Ideal buys a substantial amount of its fish from the Fulton Fish Market. Ideal also sells imported Portugese fish to at least one wholesaler in the Market. The president of Ideal is Julio Pereira, who testified that in 1985 Faicco approached him about his employees joining the union.

> ... he come to me, tell me that you sell your fish to Fulton Fish Market, why you don't join the union.

At the time Ideal had about 7 employees. Faicco testified that Pereira said that it would be too costly to have all his employees in the union. A collective bargaining agreement was entered into. However, only Pereira, a bookkeeper and two other employees joined the union. Pereira paid the initiation fees and thereafter paid the dues on behalf of all four of these persons.

The Government sought to prove that Faicco threatened Pereira or otherwise intimidated him. However, in questioning Pereira, the Government asked nothing directly on this subject. Instead, the Government approached the matter indirectly by asking whether, in interviews with the FBI in February and March 1987, Pereira had told the FBI that when he was talking to representatives of the union he suffered verbal abuse from the union representatives and slow deliveries of his fish products. At the trial Pereira denied saying such things to the FBI.

Later in the trial, FBI agent Gary Perkins testified about the February and March 1987 interviews with Pereira. The reports of these interviews were received into evidence without objection. They show that Pereira requested that these interviews be kept confidential. He told the FBI that, as his fish business began to grow, he was approached by representatives of the union about having his company organized; that he was given a "hard time" by various people connected with the union, consisting of "verbal abuse and slow

deliveries of his fish product through the Market;" that, at one point certain union representatives demanded that he sign an agreement for himself and three employees; and that, as a result, he has paid dues for these people in the amount of $104 per month. He told the FBI that, since signing the agreement he has experienced no problems, and that "$104.00 a month was a small price to pay for a hassle free business association" with the Fulton Fish Market. Pereira further said to the FBI that prior to the time of the agreement with the union his truck was unloaded by Market workers, although their service was not always satisfactory. Since he has entered into the union agreement he is allowed to unload and load his own truck.

In his February 1987 statement to the FBI, Pereira attributed the intimidating conduct to "Tony" and someone else whose name he did not know but who, according to Pereira, might have been called "Vinnie." He stated that it was Tony and the unknown individual who demanded that he sign the union contract. However, in the March 1987 interview he stated that Tony's manner was friendly and that he did not feel threatened by him in any way. It is apparently conceded that the "Tony" referred to in the statements to the FBI is Anthony Cirillo.

In his trial testimony Pereira did not describe two persons or several persons approaching him regarding unionizing his company. He did not refer to "Tony" or "Vinnie" in this regard. He testified that it was "Mr. Dennis" who approached him, and he identified Dennis Faicco in court as the person referred to.

The court finds that the Government has not sustained its burden of proving extortion committed by either Faicco or Cirillo against Pereira. The Government should have at least attempted to question Pereira *in court* (1) about whether he was threatened or otherwise put in fear, (2) the exact nature of the alleged verbal abuse, and (3) about what, if any, actions were taken against him to interfere with his business prior to his making an agreement with the union. If he had answered such questions

in a manner inconsistent with his statements to the FBI, he could have been confronted with these statements for purposes of impeachment. If this procedure had been followed there might well have been useful testimony by Pereira in court on the question of extortion. But there was not.

Basically all that we have on the subject of extortion are the records of the out-of-court statements to the FBI. Although these were received in evidence without objection, and are of some obvious significance, they present certain problems. They are inconsistent with Pereira's court testimony about the identity and number of the union personnel who approached him. The statements contain no definition of the "verbal abuse" allegedly delivered and no details of the alleged "slow deliveries of his fish product through the Market." For instance, the statements do not indicate whether the problem involved the unloaders, the loaders or the journeymen working for the wholesalers. It will be recalled that the unloaders and loaders are not unionized. The statements lack specifics which would tie the alleged slow deliveries to Cirillo or Faicco or both. To repeat, the Government had Pereira as a witness in court. It could have asked him detailed questions about these matters and did not do so. The result is that there is no testimony by Pereira under oath as to the crucial elements of the extortion claim against Cirillo and Faicco.

In addition to the deficiencies of proof mentioned above, it should be noted that there is no indication of Genovese family involvement in the Ideal/Pereira matter or of any funds received by the union being passed on to the Genovese family.

### c. *Further Findings Re Ocean and Ideal*

In the court's view, what actually occurred in the Ocean of Europe and Ideal Fish situations were compromises in which Faicco agreed not to press for full unionization of these companies in view of their claims of financial hardship. Perhaps a labor organizing expert would criticize Faicco's approach. However, no such witness was called at the trial. In any event, the

issue before the court is whether Cirillo and Faicco committed the crimes of extortion in collaboration with the Genovese family. The Government's proof does not provide a basis for such a finding in the Ocean and Ideal matters.

As to the claim that the receipt of initiation fees and dues from the owners of the companies constituted criminal Taft–Hartley violations, the court finds against the Government for the reasons stated in the previous section of this opinion.

### d. *Tsukiji Seafood*

Tsukiji Seafood is located in the Fulton Fish Market. It is owned by Mikio Kajita. This company has been in business for about seven years. Kajita joined the union shortly after he started business. He understood that it was a "union for fishermen," and that since he was a fisherman he would join the union. He remained a member until April 1988.

When his business started, Kajita had about 3 or 4 employees. A few months after Kajita started his business one employee joined Local 359. To Kajita this meant paying pension and welfare contributions on behalf of the employee. Subsequently Kajita began paying pension and welfare contributions for more of his employees. As of 1987 he had 12 or 13 persons working for him and was paying contributions on behalf of 5. As of 1988, Kajita only had 6 full-time employees handling fish and he paid pension and welfare contributions on behalf of 2.

Kajita testified that in 1987 Faicco came to him and said:

> You got to join the union, everybody, and otherwise you got to close the store.

Kajita testified that Faicco said that it was required by law for everybody to join the union, and that Faicco was shouting and cursing.

Faicco testified to a different version of this incident. He stated that Kajita was rarely in the Market and that, at the time of the incident in question, Kajita was in arrears on pension and welfare contributions for those of his employees for whom such contributions were being made. According to Faicco's testimony, his statement to Kajita was:

> I said, look, they're union employees, you have to pay, you have to pay the pension and welfare for the people.

Thus, according to Faicco, he was doing nothing more than requesting that the benefit fund contributions be brought up to date.

To return to Kajita's version, Kajita testified that after Faicco's demand Kajita went to Cirillo and complained; that Cirillo stated he did not know what Faicco was talking about and Kajita should not worry; and that Kajita did not hear from Faicco again.

On cross-examination Kajita testified that he liked Cirillo who was very fair and a nice man. Kajita also admitted that he had told the FBI that the argument with Dennis had something to do with pension and welfare fund payments.

Kajita testified that after the conversation with Cirillo he was not bothered again by Faicco. Kajita apparently never did arrange to have all of his employees join the union. However, two or three months after the conversations with Faicco and Cirillo he started making pension and welfare contributions on behalf of a few additional employees.

The Government alleges that Cirillo stopped Faicco's pressuring of Kajita because there was an agreement by Kajita with Vincent Romano and Local 359 that if Kajita kept two employees on his payroll as a favor to Romano he would not have to make pension and welfare contributions for all his employees.

It should be noted that there is no such testimony by Kajita. Kajita, who testified solely by deposition, was not even *asked* whether there was any such agreement. The only evidence supporting the Government's contention comes in the testimony of Robert Behrens. Behrens testified that he had been involved in the Fulton Fish Market for many years, that he had encountered severe financial problems and that he started to work for Kajita in March 1987. He testified that at this time two of the employees of Kajita were Richie Klein,

the nephew of Vincent Romano, and Mike Macario, who was related to Joseph Marcario, part owner of a loading crew in the Market. Behrens testified that Klein and Macario were unsatisfactory employees and that in April 1987 he urged Kajita to discharge them. According to Behrens, Kajita replied that he could not do so because he had an agreement with Vincent Romano and the union that if he kept these two men he would not need to make pension and welfare payments for all of his workers. Behrens testified that the situation with Klein and Macario changed thereafter and that by June of 1987 he was having no more problems with Klein, although Marcario was still performing badly.

Beginning in May 1987 Behrens was cooperating with the Government and assisting the Seaprobe investigation. At times Behrens wore a body recorder.

Behrens testified that in September 1987 he complained about Klein and Macario to Cirillo, who responded that he did not care who worked for Kajita as long as those two were kept on. This conversation was not recorded. Shortly thereafter Behrens had another conversation with Cirillo, which was recorded. Behrens represented that he was still having trouble with Klein and Macario and that Kajita was complaining about Behrens having to put on extra men to take up the slack. Cirillo responded by saying that he does favors in the Market and that he doesn't ask for money in return, but expects "a favor too." Keeping the "two guys" working for Kajita was the favor he expected. Cirillo stated that "there were certain people, I have to depend on certain guys I have to, ah, satisfy."

As it happened, Macario was discharged by Kajita in January 1988. Klein, who had become a satisfactory worker, remained.

It is of interest to note that shortly after Behrens went to work for Kajita, Behrens started borrowing heavily from Kajita. Behrens had a long history of gambling and of business and gambling debts. The total borrowed from Kajita was $32,000. By the end of 1987 Behrens had repaid only about $1,600 of this. At this time Behrens disappeared, saying that he was going on vacation. In fact, Behrens went into the Witness Protection Program of the Government.

The Kajita matter presents two issues: (1) Was extortion or attempted extortion committed by Faicco in demanding that all of Kajita's employees join the union? (2) Was extortion committed by Cirillo in inducing Kajita to have Klein and Macario remain in Kajita's employ?

■ As to the first issue, the salient point is that the crime of extortion was not consummated. Accepting Kajita's testimony as true, Cirillo intervened and the pressure to have Kajita put all his employees in the union was withdrawn. Did Faicco commit the crime of attempted extortion? The Government has not actually proposed this theory. In any event, the evidence about what Faicco was actually asking of Kajita is clouded. Under all the circumstances, the court finds that the Government has not proven that Faicco committed the crime of attempted extortion in the Kajita matter.

■ The next issue is whether Cirillo committed extortion in connection with Klein and Marcario. Cirillo has admitted that he helped Klein and Macario obtain jobs with Kajita. One of Cirillo's main activities is to help men find employment in the Market, although it may well be that Cirillo looked with special favor on Klein and Marcario, because one was related to Vincent Romano and the other to Joseph Marcario. But there is no evidence that Cirillo extorted Kajita into giving jobs to Klein and Marcario.

The Government points to the alleged agreement that if Kajita kept Klein and Marcario in his employ Kajita would not need to make welfare and pension payments for all his workers.

Such an agreement does not, in and of itself, constitute the crime of extortion, although it would be a thoroughly dishonorable act on the part of Cirillo to sacrifice an opportunity to organize Kajita's workers in order to arrange favors for the relatives of Vincent Romano and Joseph Marcario.

The real difficulty, however, is with the credibility of Behrens as a witness. His background prior to his employment by Kajita, and his dealings with Kajita, indicate that he is a most untrustworthy individual. His testimony regarding the alleged agreement was not corroborated by Kajita. Indeed, the Government asked no questions of Kajita on the subject. It is true that Behrens recorded a conversation with Cirillo in September 1987, but all Cirillo did then was to urge Behrens not to discharge Klein and Macario. Nothing was said in that conversation about an agreement by Kajita to keep Klein and Macario employed, or about some quid pro quo from the union in the form of refraining from organizing all of Kajita's workers.

Perhaps the most persuasive piece of evidence rebutting the claim of an agreement regarding Klein and Macario is the fact that Kajita discharged Macario shortly after the September 1987 conversations with Cirillo.

The court rules that the Government has not proved that either Faicco or Cirillo committed the crime of extortion or attempted extortion against Kajita.

As to the claim of Taft–Hartley violation arising from Kajita's union membership, the court rejects this claim for the reasons stated earlier in this opinion.

### e. *Americana Transport*

■ The final claim of extortion and Taft–Hartley violation relates to a trucking company named Americana Transport of Portland, Maine. Americana trucked fish into the Fulton Fish Market. Americana had an office in the Market and two employees, Vito Plantamura and Tony Latori, who were members of Local 359. The truck drivers were not union members.

The Government sought to prove its case through the testimony of Allen Merritt, who was a truck driver for Americana for a 14–month period in 1984–85. He testified that on occasion he brought white envelopes from Portland destined for the union, and that this occurred three or four, or maybe half a dozen, times. According to Merritt, white envelopes were also brought down by Clyde Densmore, the stepson of the owner of Americana, so that, *in toto*, white envelopes were delivered two or three times a month. When Merritt brought the envelopes he usually delivered them to Plantamura who would make arrangements for Cirillo to get them. Once or twice Merritt was told to deliver the envelopes to Anthony Prisinzano, who was one of the people who was in charge of the unloading crew for the Americana trucks. On one occasion Merritt saw Prisinzano give the envelope to Cirillo.

Merritt testified that once he asked Plantamura about the envelopes. Merritt was told that it was none of his business, but Plantamura went on to say that they were for union dues. Merritt testified that he opened an envelope once and saw $500 in cash; that on some occasions he held the envelopes to the light and saw checks; and that at other times the envelopes had the thickness of the envelope containing the cash.

Merritt testified that, unlike trucks of other companies, Americana's trucks experienced no delays in being unloaded and no vandalism.

On the basis of this testimony the Government argues that Americana made "several payments per month to the union" for protection against vandalism and delays in unloading (Post-trial Brief p. 55).

However, during the trial, it soon became apparent that Merritt was another untrustworthy witness proffered by the Government. Among other things, he gave a wholly incredible recital of his schedule of trips into the Market driving Americana trucks. More important, the testimony of a co-owner of Americana and of Vito Plantamura demonstrated convincingly that Americana made regular payments to the union of dues deducted from the paychecks of Plantamura and Latori, and that Americana and made regular contributions to the welfare and pension funds. All these payments and contributions were by check and were usually sent down by truck for hand delivery to the union. The Government has failed to prove by credible evidence that any payments were made by Americana to

the union other than for the proper purposes here described.

The court finds that the Government has not made out a case of extortion or Taft-Hartley violation in the Americana matter.

*Miscellaneous Points From the Evidence*

It is necessary to comment on certain additional evidence on which the Government has placed substantial emphasis.

The Government introduced a tape recording of a conversation between John Napoli and Joseph Chilli III, which took place on November 16, 1984. Also introduced was Napoli's deposition, dealing mainly with this conversation. Chilli was connected with the Bonanno crime family, which had certain gambling operations in the Fulton Fish Market. Napoli was a criminal who had begun to cooperate with the Government.

The court has concluded that the conversation and the deposition are of no real weight in determining the issues about Cirillo and Faicco in this case. The conversation and deposition contain lurid recitals of organized crime activities, some in the Market. But there is not the slightest indication of any connection of these activities with Cirillo or Faicco. The only reference to the union was the following testimony in Napoli's deposition:

Q. Did Mr. Chilli ever tell you anything about a man named Carmine Romano? Did Mr. Chilli ever tell you anything about a man named Vincent Romano?

A. Yeah. He's one of the people who are running the fish market. Vince Romano was a known person who was running the fish market and his brother Carmine Romano also was a delegate and who also ran the fish market. And they also were known for extorting and bookmaking and shylocking. And they would basically tell who could work there and who couldn't work there in such a form.

If I was working there, and I was a union member, and came from the union stone cold, and you were a union member, and you came through Vincent or Carmine Romano, and there was someone who was going to go, I would go first because you came from them and I came from the union.

Basically they ran the union, and—they called the shots.

There is no basis for the court to find that this testimony refers to anything other than the time when Carmine and Vincent Romano worked as a team, prior to Carmine's criminal conviction in 1981, and, of course, prior to Cirillo becoming president of the union.

Another piece of evidence often cited by the Government is the testimony of FBI agent Marley regarding a conversation between Vincent Romano and Cirillo on December 24, 1985. On that occasion Marley observed Romano sitting at Carmine's Bar and Grill with Columbo Saggese, a member of the Genovese family. Cirillo joined Romano and Saggese. Marley overheard the latter two conversing about betting on a football game. Saggese then left. After this Cirillo said something to Romano about thefts from shipments coming into the Market. Romano replied to the effect that the person complaining should not

... dictate to us. We run this place. You got to tell him we have the market.

Then Romano stated in substance that the person could run his trucks to Philadelphia if he was dissatisfied with the Fulton Market.

The Government relies on this conversation, not as evidence of any specific criminal activity by Cirillo, but simply to show that the Genovese family, through Vincent Romano, controlled the Fulton Fish Market, the union and Cirillo.

The court accepts the testimony of Agent Marley as accurately describing the December 1985 conversation. The probable meaning of the conversation is that Cirillo was relaying to Romano the complaints of a trucker regarding threats. Romano replied by saying that "we" run the Market. However, Romano made no offer to stop the thefts, and certainly no suggestion was made of obtaining a payoff for protection.

This conversation is not without its sinister connotation in respect to Cirillo. Among other things, Cirillo was approach-

ing Romano for help on the theft problem instead of urging the trucker to go to the police. However, the questions in the case are (1) whether Cirillo and Faicco are guilty of crimes constituting RICO violations; and (2) whether the remedy for organized crime activity in the Market should go farther than the present judgments against the Genovese defendants, and should provide for the ouster of Cirillo and Faicco from their union posts.

In this connection, it is of interest to consider a conversation Cirillo had with one John Heagy about a year after the conversation at Carmine's Bar and Grill. The Heagy incident occurred on December 12, 1986. Heagy was a trucker and was assisting the Seaprobe investigation. On the day in question he went to Cirillo's office at the union wired with a body recorder.

Heagy purported to be complaining about delays by the unloading crew which serviced his trucks, and also to be complaining about thefts of fish and wooden pallets. In having Heagy record this conversation, the Government obviously hoped to obtain some statement by Cirillo about Vincent Romano's control and perhaps a suggestion that Romano and Cirillo could deal with Heagy's problems in return for an appropriate payoff.

There is no indication that Cirillo suspected that the conversation was instigated by the Government or was being recorded. What did occur was that Cirillo addressed the problems presented by Heagy in an entirely reasonable and legal manner. Cirillo did not allude in any way to Vincent Romano, and did not indicate that Romano or anyone else controlled the Market. Cirillo made no suggestion about Heagy making a payment of money for protection or for any other reason.

Cirillo's response to Heagy's complaints about the unloaders was that he had nothing to do with their operation since he merely ran the union. Nevertheless, he did not want to see any company leave the Market. "The more fish that come into this market the more men I put to work."

Heagy then asked if he could switch unloading crews, or if there was someone who could stop the problems created by the present crew. He asked, "Where are we gonna go?" The question was obviously designed to determine whether Cirillo would name Vincent Romano as the arbiter of the problems of the Market. Cirillo replied simply: "I'm not the guy. I'm not the guy to tell [the crew] what to do." Cirillo went on to remark about Heagy's unloading crew: "He's probably unloading your fish for forty years, you know. They ain't gonna buck one another."

At that point Cirillo came up with a proposal which he repeated several times. "I'm going to try to sit them all down and tell them your problem." It is not clear whether this meant all the members of Heagy's unloading crew or representatives of all the unloading crews in the Market. However, what is clear is that Cirillo was proposing a discussion to seek a voluntary solution to Heagy's problem. No suggestion was ever voiced of force or coercion or payoffs. Cirillo realized that Heagy might send some of his fish "to Philadelphia" and thus deprive the Fulton Market of some business and jobs. Cirillo stated, however, "I can only discuss it with them." Heagy asked, "Where do I go?" in the event the discussion did no good. Cirillo's only answer was to persist in the proposal for a discussion. "Let's see if we can get a dialogue."

It is of interest to note that whereas in December 1985 Vincent Romano was suggesting that a party complaining of thefts take his merchandise to Philadelphia, in the December 1986 conversation Cirillo was striving to prevent the diversion of fish to Philadelphia and was seeking a way to resolve the complaints presented by Heagy.

Certain other evidence bears in a more general way on the conduct of Local 359 during the regime of Cirillo and Faicco.

FBI agent James Kossler was called by the Government because of his thorough knowledge of organized crime, particularly in metropolitan New York City. On cross-examination Kossler testified that there are several ways in which an organized crime family can benefit from controlling a labor union. Three of the principal ways

are (1) misappropriating funds from the union treasury; (2) misappropriating funds from the pension and welfare funds; (3) extorting money from employers for labor peace or for an adequate supply of labor. Kossler was asked if he knew of any instance, since the commencement of the Local 359 trusteeship in August 1981, in which such acts had been committed in connection with Local 359. Kossler replied in the negative. Kossler also stated that he had seen no evidence of anything he would characterize as illegal labor payments to Local 359 officials since the start of the trusteeship.

Robert Smith was a witness for the defense. He has been involved in the wholesale fish business for 35 years. He is a rugged and independent businessman, and a thoroughly reliable witness. He has been dealing with Cirillo for several years as a fellow trustee of the pension and welfare funds, and also in regard to labor grievances. Smith testified that his dealings with Cirillo have been businesslike, that Cirillo has been honorable at all times, and that Smith has never been threatened or harassed by Cirillo in any way. Smith knows of no improper payments to Cirillo. Smith recalls that there were formerly work stoppages in the Market to coerce wholesalers in one way or another. He is not aware of any such stoppages since Cirillo has been president of the union. Smith described the general atmosphere of the Market in recent times, dating from the jailing of Carmine Romano:

> THE WITNESS: All right. From the perspective of being a dealer, I have the general sense of being uninhibited. I can hire whom I please as I please. I can remove people, within, of course, the scope of our contract, as I please. I can handle products as I please.
>
> I don't feel uncomfortable walking around with cash in my own pocket, and I am not making any unscheduled payments in order to achieve this liberty, this ability to operate.

## CONCLUSION

On the basis of the evidence as a whole, the court concludes that the Government has failed to prove that Anthony Cirillo or Dennis Faicco has conducted, or participated in, a pattern of racketeering activity in connection with the Fulton Fish Market in violation of the RICO statute. The proof offered by the Government has not been sufficient to support its essential claim— *i.e.,* that the Genovese family currently controls, and in recent years has controlled, Local 359 and its principal officers, Cirillo and Faicco. As to the specific crimes alleged against Cirillo and Faicco as constituting their participation in a pattern of racketeering, the Government has not sustained its burden of proof to show the commission of such crimes.

This is not to say that there is no evidence of the presence of organized crime, particularly Genovese family operatives, in the Fulton Fish Market. Vincent Romano is undoubtedly associated with the Genovese family and was regularly present in the Market over a period of many years. As to Cirillo, the evidence shows that Romano and Cirillo were friends and spoke together frequently.

However, as already described, this does not in and of itself prove criminal conduct on the part of Cirillo. Moreover, the strictures of the consent and default judgments have been imposed upon the Genovese family defendants, including a provision barring Vincent Romano from the Market. An administrator has been appointed and has been provided with an investigative staff for the purpose of enforcing these judgments. Thus, the attempt to rid the Fulton Fish Market of organized crime, which was begun with the criminal prosecutions of 1981, is continuing by means of these remedies. The Government has not shown that it is entitled to the additional remedy of having Cirillo and Faicco removed from their union offices.

For the foregoing reasons, the complaint in this action is dismissed as to defendants Anthony Cirillo, Dennis Faicco and Local 359.

SO ORDERED.