UNITED STATES of America, Plaintiff-Appellee,

v.

Kevin V. LeROY and John Hitchings, Jr., Defendants-Appellants.

Nos. 900, 1057, Dockets 81–1412, 81–1472.

United States Court of Appeals, Second Circuit.

Argued May 26, 1982.

Decided Aug. 18, 1982.

Certiorari Denied Jan. 24, 1983.

See 103 S.Ct. 823.

Mervyn Hamburg, U. S. Dept. of Justice, Washington, D. C. (George H. Lowe, U. S. Atty., Kevin E. McCormick, Syracuse, N. Y., of counsel), for plaintiff-appellee.

Eric M. Alderman, Syracuse, N. Y. (Emil M. Rossi, Alderman, Samuels, Jerry & Rossi, Syracuse, N. Y., of counsel), for defendant-appellant Kevin V. LeRoy.

Paul R. Shanahan, Syracuse, N. Y. (R. J. & P. R. Shanahan, Syracuse, N. Y., of counsel), for defendant-appellant John Hitchings, Jr.

Before LUMBARD, MOORE and OAKES, Circuit Judges.

LEONARD P. MOORE, Circuit Judge:

Kevin V. LeRoy and John Hitchings, Jr., appeal[1] from judgments of conviction entered in the United States District Court for the Northern District of New York, following a jury trial before the Honorable Lloyd F. MacMahon. LeRoy was convicted of one count of conspiracy to violate Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (1976), and two counts of embezzlement of labor union funds, in violation of the Labor Management Reporting and Disclosure Act of 1959 ("Landrum-Griffin Act"), 29 U.S.C. § 501(c) (1976). Hitchings was convicted of two counts of making illegal payments to a labor union representative, in violation of 29 U.S.C. § 186(a) (1976) ("Taft-Hartley Act"), and two counts of perjury before the grand jury, in violation of 18 U.S.C. § 1623(a) (1976). Judge MacMahon sentenced LeRoy to three concurrent three-year terms of imprisonment and fined him $5,000. In addition, LeRoy was ordered by special jury verdict to forfeit his office in Local 214. Hitchings was sentenced to imprisonment for six months and fined $5,000 on each count, with the prison terms and fines to run concurrently. We find that the claims of error raised by Hitchings and LeRoy are without merit. Accordingly, we affirm the judgments of conviction.

This case stems from a comprehensive investigation by the Department of Justice into a pattern of racketeering activity on the part of representatives of Laborers International Union of North America, Local 214 ("Local 214"). Local 214 was the recognized union and the exclusive bargaining agent for laborers in the Oswego County, New York area. Evidence introduced before the grand jury and again at trial showed that union representatives had solicited kickbacks from area businessmen in the form of fictitious "travel" checks and payment for "no show" jobs.

Since the charges lodged against the two defendants, LeRoy and Hitchings, who have perfected appeals[2] are largely unrelated, we will discuss the evidence leading to each conviction separately. In fact, the only common denominator justifying a joint trial is that Local 214 and some of its members are involved.

## LEROY

Kevin V. LeRoy served as vice-president of Local 214 from June 1, 1975 until May 30, 1978. During this period, he was placed on the payroll of several subcontractors and received compensation, although he performed no work for these companies.

In 1974, Timbello Enterprises ("Timbello"), a general contractor, hired union laborers to assist in the construction of a plant for the Miller Brewing Company in Oswego County. Co-defendant Ronald Scaccia, the union's business manager, assigned LeRoy throughout 1975 to the Timbello day labor crews as the job steward. Pursuant to an agreement with Timbello, LeRoy was permitted time off from the job to perform union business. Although Timbello officials

1. A Joint Appendix has been filed on behalf of LeRoy. A separate "Brief and Appendix" was filed on behalf of Hitchings, containing his motion to set aside the verdict "upon the ground that the prosecution withheld from said defendant and failed to furnish to him exculpatory evidence material to the issue of said defendant's guilt ..." and the trial court's memorandum and order denying the motion.

2. Three other men, Ronald Scaccia, Edward Cagnoli, and Francis Scaccia, were tried with LeRoy and Hitchings and convicted. On March 31, 1982, this Court dismissed the appeals filed by the Scaccias and Cagnoli because they failed to file briefs and appendices within the allotted time. A sixth man, Orlando Testi, was tried with the others and acquitted.

consulted LeRoy on labor matters and he resolved the few labor disputes that arose, LeRoy was never observed performing physical labor. Nevertheless, he received "wages" from Timbello in the amount of $4,430.49. Raymond Garhartt, general superintendent of construction for Timbello, testified that LeRoy's retention on the payroll was to assure the company that there would be no serious labor disputes.

While LeRoy was on Timbello's payroll, he also received compensation from several other subcontractors involved in the plant's construction. He performed no work, however, for these subcontractors. On March 8 and 9, 1975, LeRoy was placed on the payroll of the Labarge Brothers Construction Company ("Labarge Brothers"), an excavation and pipe contractor, receiving "payroll" checks totalling $101.08. Irving J. Wood, an employee supervisor of Labarge Brothers, stated at trial that although LeRoy was hired to perform services for the company, he performed none. Similarly, from May 19, 1975 to January 20, 1976, LeRoy was on the payroll of the Gilbane Building Company, the managing contractor. In addition, from mid-June to mid-October, 1975, H. J. Benedict & Sons, a contractor involved in the installation of sewers and water lines at the construction site, placed LeRoy on its payroll and paid him a total of $1,230.42. Harry J. Benedict, owner of H. J. Benedict & Sons, testified that although he did not observe LeRoy performing any services for his company, he retained LeRoy on the payroll "to keep peace with the laborers."

In 1978, LeRoy was elected to the full-time position of the union's business manager. As business manager, LeRoy was responsible for assigning work to laborers, visiting job sites, and serving as chief negotiator on behalf of the union. He received a $38,000 annual salary and was reimbursed for expenses incurred while on union business. LeRoy also was authorized to charge the union for expenses associated with the operation of his private car in connection with union affairs.

In May, 1979, LeRoy made four purchases of gasoline from Fisher's Sunoco, a service station in Oswego County. The service station gave LeRoy four credit card receipts, totalling $63.25, for his purchases of gasoline. Fisher's Sunoco billed Local 214 directly, however, for the purchases. On June 4, 1979, the union paid Fisher's Sunoco $63.25. LeRoy, however, subsequently submitted the credit card receipts to Local 214 for reimbursement, and on June 19, 1979, he received a check made payable to himself, in the amount of $63.25, thus causing Local 214 to make a double payment for the gasoline.

On June 4, 1979, LeRoy brought his car for brake repairs to Barilla's AAA Service in Oswego County. Frank Barilla, the owner of the service station, charged LeRoy $250.27 for the repairs and issued an invoice in that amount. LeRoy paid for the work in cash and submitted the invoice to the union. Local 214 issued a check dated June 4, made payable to LeRoy, in the amount of $250.27.

On June 19, 1979, LeRoy obtained another check from Local 214's treasury, made payable to Barilla's AAA Service, in the amount of $212.24, to cover "car repairs and gas." LeRoy took the second check to the service station and informed the owner's wife, Lorraine Barilla, that it was issued to cover a payment that he had already made in cash. LeRoy requested Mrs. Barilla to cash the check and give him the proceeds so that he could be reimbursed for his cash outlay. Mrs. Barilla complied. Shortly thereafter, the Barillas searched their records for an invoice in the amount of $212.24 but were unable to locate one.

## HITCHINGS

John Hitchings, Jr. managed Industrial Tank & Line Cleaning Company ("Industrial"), a contracting concern owned by Hitchings' father. Industrial was a non-union contractor and therefore was not required to make contributions to Local 214's pension and welfare funds when it hired union laborers. In May, 1979, Niagara Mohawk Power Corporation awarded Industrial a contract to clean an oil storage tank damaged by fire. Industrial commenced work

on the tank in early August. Hitchings' work force consisted of his own men and several members of Local 214. Co-defendant Edward Cagnoli, a member of Local 214, was designated as the foreman for the project. Although Cagnoli never entered the storage tank to assist in the cleaning process, he received paychecks from Industrial totalling $469.73.

Cagnoli had also informed Lawrence Carr, another member of the union, about this job opportunity. Cagnoli told Carr that he would receive from Industrial a regular paycheck and a supplementary check for "travel expenses." Cagnoli directed Carr to endorse the second check and to turn it over to him. Members of Local 214 worked on the Industrial job for two pay periods, during which time Hitchings prepared a total of four checks in each of the laborers' names. Carr was given, however, only two of the checks; he never saw and did not endorse the other two that named him as payee.

Shortly after the cleaning project was completed, Ronald Scaccia, who at this time served as the local's full-time clerk, and Cagnoli visited the work site and spoke with Hitchings.[3] Hitchings announced that the work had been completed and that the laborers' wages would continue until the following evening. He then asked the two men, "Do you want those, ah, do you want those travels?" Scaccia replied affirmatively. Hitchings responded, "Let me give them to you."

Later in the conversation, Cagnoli asked Hitchings, "Will you have those checks?" Hitchings responded, "What, travel?" Cagnoli said, "Yeah, and mine." The "travel expense" checks that Cagnoli and Scaccia ultimately received from Hitchings totalled $938.41.

On January 10, 1980, Carr appeared before a grand jury investigating the activities of Local 214. Carr drove to the proceedings with Cagnoli who instructed him not to mention to the grand jury that he had worked on the storage tank cleaning project. After he was questioned by the grand jury, Carr advised Cagnoli that he had followed Cagnoli's directions. Cagnoli replied that Carr's denial was a mistake and that Carr, in fact, should have admitted working on the storage tank cleaning job since it was likely the authorities were aware he had done so. That evening, Carr met with Scaccia, Cagnoli, and the union's attorney. The attorney subsequently contacted the Assistant United States Attorney conducting the investigation and informed him that Carr had worked on the job.

On January 11, 1980, Hitchings appeared before the grand jury to discuss the storage tank cleaning contract. Hitchings testified that after contacting Scaccia in order to obtain additional laborers, he was able to hire four or five union members for whom he made pension and welfare contributions. Hitchings explained, however, that because Industrial was a non-union contractor, he could not make the payments directly to the union. Accordingly, Hitchings stated that he made the checks payable to the employees and informed some of them that they would be required to submit the checks to the union. Hitchings admitted, however, that he made no notation on the checks concerning the purpose of these payments.

Hitchings also denied that Scaccia demanded money for himself. He stated that Scaccia had visited the work site on two or three occasions merely to demand that Hitchings sign a union contract. Moreover, Hitchings repeatedly denied ever discussing "travels" with Scaccia or checks for travel expenses with Cagnoli. In fact, Hitchings testified that he never heard the term "travels" and that he did not know what the term meant.

On January 24, 1980, Carr returned to the grand jury for additional questioning. A few days before his second grand jury appearance, Carr, Robert Wilson, the general foreman of the storage tank cleaning project, as well as William Alton, Walter Mays, and co-defendant Orlando Testi, all

---

**3.** The conversation between Scaccia, Cagnoli, and Hitchings was tape recorded pursuant to a properly issued warrant. Neither appellant challenges the propriety of the recording.

three union members who had worked on the job, met with Scaccia and Cagnoli. Scaccia directed the laborers to tell the grand jury that they had received the proceeds of the supplemental "travel expense" checks issued by Hitchings. Carr followed Scaccia's instructions, as did the others, and informed the grand jury that he had received the "supplemental expense" checks and their proceeds.

Carr, however, ultimately recanted his grand jury testimony concerning the supplemental "travel expense" checks. On August 28, 1980, Carr appeared a third time before the grand jury and testified that he never received those checks or their proceeds.

Rather, Carr stated that Cagnoli had admitted receiving them. Unlike Carr, the other union members who were questioned by the grand jury about the "supplemental" checks never retracted their testimony.

Three days before Carr testified at trial, the Government disclosed all Carr's grand jury testimony to Hitchings. The Government, however, did not disclose the grand jury testimony of Wilson, Alton, and Mays stating that they had received the "supplemental" checks and their proceeds. This testimony was never requested, either specifically or generally, by Hitchings' attorney.

## DISCUSSION

### LEROY

■ LeRoy claims on appeal that the evidence was insufficient as a matter of law to find him guilty of conspiring to violate Section 1962(c) of RICO, in violation of 18 U.S.C. § 1962(d) (1976), and of embezzling labor union funds, in violation of the Landrum-Griffin Act, 29 U.S.C. § 501(c) (1976). The guidelines for reviewing the sufficiency of evidence supporting jury verdicts in criminal cases are well established. The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the Government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We must thus consider circumstantial as well as direct evidence, and where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. *United States v. Fisher*, 484 F.2d 868, 869–70 (4th Cir. 1973), *cert. denied*, 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974). Realizing that the scope of our inquiry into the sufficiency of evidence is circumscribed, we conclude that the jury could reasonably have determined that the evidence was sufficient to convict LeRoy on all counts.

Pursuant to Section 1962(c), it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Unions are expressly included within the term "enterprise." 18 U.S.C. § 1961(4) (1976).

LeRoy concedes that the Government conclusively proved the existence of an enterprise affecting interstate commerce— namely Local 214. He also admits that the Government demonstrated LeRoy's, as well as his co-conspirators', association with the union. LeRoy contends, however, that the Government failed to show that he participated in the conduct of the union's affairs or that his activities constituted a "pattern" of racketeering activity.

■ Specifically, LeRoy alleges that the Government proved at most illegal conduct committed in furtherance of LeRoy's personal interest, but not in the conduct of the union's business. Accordingly, LeRoy argues, his actions fall beyond the purview of the statute. We find no merit to LeRoy's contention and conclude that his actions took place in the conduct of Local 214's affairs and thus, within the scope of RICO.

LeRoy's argument is merely a recapitulation of one already presented to this Court

in *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). In *Scotto, supra*, an appellant argued that the jury was improperly instructed on the issue whether appellant conducted a union's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (1976). The appellant in *Scotto* requested the district court to charge the jury that it had to find that the predicate acts "concerned or related to the operation or management of the enterprise" and "[a]ffected the affairs of the [union] in its essential functions." *Id.* at 54. Rejecting this argument, this Court recognized that while RICO does not specify the degree of interrelationship between the pattern of racketeering and the conduct of the enterprise's affairs, the Act also does not require that predicate acts be in furtherance of the enterprise. Accordingly, the Court stated that

> one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses *solely by virtue of his position in the enterprise* or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

*Id.* (emphasis supplied). *See also United States v. Kaye*, 556 F.2d 855, 861 (7th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

The evidence in this case demonstrates that LeRoy accepted unearned wages while he served as vice-president of Local 214 from various contractors who testified that they paid him in order to preserve union peace, in violation of the Taft-Hartley Act, 29 U.S.C. § 186(b)(1) (1976), and later used his position as business manager to obtain payments from the union treasury for expenses not properly incurred, in violation of the Landrum-Griffin Act, 29 U.S.C. § 501(c) (1976). These violations of the Landrum-Griffin and Taft-Hartley Acts were the predicate offenses forming the pattern of racketeering. LeRoy was able to commit these predicate offenses solely by virtue of his positions in Local 214, since the predicate acts were inextricably tied to LeRoy's role as a union official.

■ We also reject LeRoy's argument that the Government failed to prove that his participation in the union's affairs was "through a pattern of racketeering activity." A "pattern of racketeering activity" is established by proof of the commission of at least two "acts of racketeering" within a ten-year period. 18 U.S.C. § 1961(5) (1976). Moreover, a violation of either the Landrum-Griffin Act, 29 U.S.C. § 501(c) (1976), or the Taft-Hartley Act, 29 U.S.C. § 186 (1976), constitutes an act of racketeering. 18 U.S.C. § 1961(1) (Supp. IV 1980). Since the evidence demonstrates that LeRoy violated the provisions of these acts on more than two occasions, the Government clearly proved a pattern of racketeering activity.

■ LeRoy also argues that the evidence fails to support his conviction of embezzling labor union funds, in violation of the Landrum-Griffin Act, 29 U.S.C. § 501(c) (1976). Viewing the evidence in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude, however, that the evidence amply supports LeRoy's conviction. In order to prove a violation of Section 501(c), the Government must demonstrate that the individual has embezzled, stolen, or unlawfully and wilfully abstracted or converted union funds to his own use or the use of another. Any uncertainty concerning the wilfull intent to commit the act is for the jury to resolve.

■ LeRoy maintains that the expense items for which the union was billed and which the union paid were authorized and adopted by it without his having made any wilful or fraudulent misrepresentations. The Government, however, adduced at trial sufficient evidence from which the jury could have found beyond a reasonable doubt that LeRoy submitted to the union vouchers that he knew did not represent expenditures made on the union's behalf, and that he received the proceeds of the checks issued by the union to cover these expenses.

The jury could reasonably have inferred, in turn, that LeRoy intended to receive and knew he was receiving union funds for expenses already paid by Local 214.

■ Finally, LeRoy claims that the sentence imposed upon him was unconstitutional. He fails, however, to present an argument or a case in support of his position. LeRoy was sentenced to three concurrent three-year terms of imprisonment and fined $5,000. He was also ordered to forfeit his office in Local 214. Since the sentence imposed upon LeRoy was well within the statutory limits and was not so disproportionate to the gravity of his offenses that it violated the Eighth Amendment, see *United States v. Vila*, 599 F.2d 21, 26 (2d Cir.), cert. denied, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979), the district court did not err in fashioning LeRoy's sentence.

## HITCHINGS

Hitchings argues at some length that the Government violated his due process rights articulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the allegedly exculpatory grand jury testimony of Robert Wilson, William Alton, and Walter Mays, union members who had worked on the storage tank cleaning project. Although these men did not testify at trial, they stated before the grand jury that they had received the proceeds of the supplemental "travel expense" checks issued by Hitchings. Unlike Carr, they never recanted their grand jury testimony.

Hitchings had previously raised this claim before the district court in his motion for an order setting aside his conviction. That court found no merit in Hitchings' contention and denied his motion in a comprehensive and well-reasoned opinion. Agreeing with the trial court that the Government did not suppress exculpatory evidence in violation of Hitchings' right to due process, we conclude that the district court properly denied Hitchings' motion to set aside his conviction.

■ In *Brady v. Maryland, supra,* the Supreme Court held that suppression by the prosecutor of material evidence specifically requested by the defense counsel deprives a defendant of his right to due process. *Id.* at 87, 83 S.Ct. at 1196. Subsequent interpretations have emphasized that the heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of defense counsel's request, when the evidence is favorable to the accused and is material to the determination of guilt or to the appropriate punishment. *Moore v. Illinois*, 408 U.S. 786, 794, 92 S.Ct. 2562, 2567, 33 L.Ed.2d 706 (1972). Although the Supreme Court has extended the *Brady* doctrine to cases in which the defendant failed to request disclosure, see *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the defendant must still prove that the Government, in fact, suppressed the evidence in question and that this evidence was material. Applying the principles of *Brady*, we find that the two essential elements are missing in this case.

■ Evidence is not "suppressed" if the defendant either knew, see, e.g., *United States v. Robinson*, 560 F.2d 507, 518 (2d Cir. 1977), cert. denied, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), or should have known, see, e.g., *United States v. Brown*, 582 F.2d 197, 200 (2d Cir.), cert. denied, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978), of the essential facts permitting him to take advantage of any exculpatory evidence. As a result, the Government is not required to disclose grand jury testimony to a defendant who is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *United States v. Stewart*, 513 F.2d 957, 600 (2d Cir. 1975).

In the instant case, Hitchings was aware long before trial that Wilson, Alton, Mays, and Carr had been in his employ. Hitchings also knew that he had been charged as a participant in the "travel expense" check scheme, and that Wilson had been named as co-defendant. Moreover, three days before

Carr testified at trial, the Government disclosed all Carr's grand jury testimony to Hitchings' defense counsel. Thus, Hitchings knew Carr had testified that Scaccia had instructed him as well as Wilson, Alton, and Mays to lie to the grand jury concerning the identity of the persons who had received the proceeds of the "travel expense" checks. Hitchings was, therefore, on notice that Wilson, Alton, and Mays might have testified before the grand jury and that their statements might have supported his defense.

The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government. *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973). Here Hitchings clearly was on notice of the facts necessary for him to take advantage of such exculpatory testimony as Wilson, Alton, and Mays might conceivably furnish. If Hitchings had desired to have the testimony of Wilson, Alton, and Mays, the obvious course was to subpoena the three men and call them to the witness stand. Hitchings, however, failed to act when he first received Carr's grand jury testimony, and again when he heard Carr restate that testimony at trial. Accordingly, we conclude that the Government was under no duty to advise Hitchings of the allegedly exculpatory grand jury testimony of Wilson, Alton, and Mays.

▮ Even if the Government had improperly failed to disclose this evidence, the grand jury testimony of the three men was not material within the meaning of the *Brady* rule. In *United States v. Agurs, supra*, the Supreme Court adopted guidelines for determining whether evidence is to be considered material under *Brady*. The majority in *Agurs, supra*, stated that in cases where the defendant makes no request or only a general request for evidence that is then not disclosed, he has a right to a new trial only if the undisclosed evidence, evaluated in the context of the entire record, creates a reasonable doubt that otherwise would not exist. *Id.* 427 U.S. at 112–13, 96 S.Ct. at 2401–02.

Since no request was made in this case, Hitchings' burden under *Agurs, supra*, is to demonstrate that the undisclosed evidence creates a reasonable doubt about his guilt. Hitchings has failed to meet this burden. Hitchings was convicted of perjury before the grand jury when he denied having discussed "travel expense" checks with Scaccia and Cagnoli. The central piece of evidence supporting his perjury conviction is a tape recorded conversation between Hitchings, Scaccia, and Cagnoli during which Hitchings twice referred to "travel expense" checks. Since the grand jury testimony of Wilson, Alton, and Mays concerns the identity of the individuals who received the proceeds of the supplemental "travel expense" checks, their testimony is completely unrelated to the issue whether Hitchings referred to "travel expense" checks in the presence of Scaccia and Cagnoli.

Hitchings was also convicted of two counts of making illegal payments to labor union representatives. Several named Cagnoli as payee, although he performed no work for Hitchings' company. Hitchings does not contend, and we do not see how he could, that the grand jury testimony of Wilson, Alton, and Mays that they received the proceeds of the supplemental "travel expense" checks could have created a reasonable doubt concerning the legality of the payments made directly to Cagnoli. Hitchings asserts, however, that the grand jury testimony of these three individuals raises a reasonable doubt on the issue whether the "travel expense" checks made payable to these three men as well as to Carr were in fact illegal payoffs. Carr testified at trial that he was not the actual payee, but that Cagnoli had received the proceeds of the checks made payable to Carr. Carr's trial testimony was corroborated by a series of taped conversations among Scaccia, Cagnoli, and others in which the payoff scheme was described in detail. That Wilson, Al-

**620**

ton, and Mays may have received the proceeds of their checks is irrelevant to the issue whether Carr received the proceeds of his check, and proof that Cagnoli had, in fact, received the proceeds of Carr's checks is alone sufficient to convict Hitchings of making illegal payments to a labor union representative. Accordingly, we conclude that the grand jury testimony of the three men is also immaterial within the meaning of *United States v. Agurs, supra,* to the question whether the supplemental "travel expense" checks made payable to Carr were actually illegal payoffs.

Hitchings also argues that his testimony before the grand jury concerning the "travel expense" checks was not material as a matter of law. Specifically, he claims his denial that he understood the meaning of the term "travels" was "at best ancillary to the investigation" and that a mistaken answer "would not have influenced a fact finder one way or the other."

 False statements are material only if they "bear upon issues under investigation by the grand jury." *United States v. Byrnes,* 644 F.2d 107, 111 (2d Cir. 1981). "Given the wide ranging investigative function of the grand jury, [however,] the materiality of its inquiries must be broadly construed." *United States v. Berardi,* 629 F.2d 723, 728 (2d Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). As a result, a defendant's answers are "material" under the perjury statute, 18 U.S.C. § 1623 (1976), if truthful answers to the grand jury's questions could assist the inquiry while false responses would likely hinder it. *Id.*

 Hitchings' contention that his false statements concerning the "travel expense" checks were not material is unavailing. One of the suspicious circumstances investigated by the grand jury was the receipt of payoffs, however disguised, by individuals like Scaccia and Cagnoli. Hitchings thus errs in asserting that the grand jury questions posed to him regarding checks falsely designated as reimbursement for travel expenses were unrelated to the investigation, and that his answers were therefore not

material. As the payor of these checks, Hitchings clearly had the potential to influence the grand jury investigation. An accurate revelation of his conversations with Scaccia and Cagnoli would have corroborated other evidence of the "travel expense" checks scheme. Hitchings' denials, however, created or maintained the false impression that he was either unaware or unaffected by the scheme, and thus deprived the grand jury of the benefit of his knowledge. Accordingly, Hitchings' testimony was material because it "was capable of influencing the fact finder in deciding the issues before it." *United States v. Fayer,* 573 F.2d 741, 745 (2d Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978).

We have examined Hitchings' other claims and find them to be without merit. Affirmed.