889 F.2d 1232
 132 L.R.R.M. (BNA) 2978, 113 Lab.Cas. P 11,668
 UNITED STATES of America, Plaintiff-Appellant,
v.
LOCAL 359, UNITED SEAFOOD WORKERS, SMOKED FISH & CANNERY
UNION, United Food and Commercial Workers International
Union, AFL-CIO, CLC, Executive Board and Officers of Local
359, United Seafood Workers, Smoked Fish & Cannery Union,
United Food and Commercial Workers International Union,
AFL-CIO, CLC, et al., Defendants,
Local 359, United Seafood Workers, Smoked Fish & Cannery
Union, United Food and Commercial Workers
International Union, AFL-CIO, CLC,
Anthony Cirillo and Dennis
Faicco, Defendants-Appellees.
 No. 39, Docket 89-6069.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 20, 1989.
Decided Nov. 15, 1989.
 
 Edward T. Ferguson, III, Asst. U.S. Atty., S.D.N.Y., New York City (Benito Romano, U.S. Atty., S.D.N.Y., New York City, Randy M. Mastro and Nancy Kilson, Asst. U.S. Attys., S.D.N.Y., New York City, of counsel), for plaintiff-appellant.
 J. Kenneth O'Connor, Long Island City, N.Y. (Thomas T. Heney, O'Connor & Mangan, P.C., of counsel), for defendants-appellees.
 Before VAN GRAAFEILAND, MESKILL and KEARSE, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 The United States appeals from a judgment of the United States District Court for the Southern District of New York (Griesa, J.) dismissing a civil RICO action against Local 359 of the United Seafood Workers, Smoked Fish & Cannery Union, Anthony Cirillo, its president, and Dennis Faicco, its secretary-treasurer. See 705 F.Supp. 894 (S.D.N.Y.1989). We affirm in part and remand in part.
 
 
 2
 The Fulton Fish Market (the Market), located on the lower east side of Manhattan, is the center of the wholesale seafood industry for the New York City area. Local 359 has approximately 600 members, most of whom work at the Market. For many years, the Government suspected, and at times was able to prove, that the Genovese Family of La Cosa Nostra, or the Mafia, exerted corrupt influence over the Market through its control of Local 359. In 1982, two officers of the Local, Carmine Romano and Peter Romano, were convicted of exacting illegal payments from Market employers, misuse of Union funds and other unlawful acts. See United States v. Romano, 684 F.2d 1057 (2d Cir.), cert. denied, 459 U.S. 1016, 103 S.Ct. 375 & 376, 74 L.Ed.2d 509 (1982). Carmine Romano was a "soldier" in the Genovese Family; Peter Romano is his brother.
 
 
 3
 In 1984, convinced that Genovese influence in the Market did not end when the Romanos went to prison, the FBI and the New York City Police Department began a joint investigation into organized crime's involvement in the seafood industry, particularly in the Market. This investigation led the Government to conclude that Vincent Romano, another brother of Carmine, had assumed control of Genovese criminal activities in the Market. The Government believed that Vincent exercised this control through appellee Cirillo, the Local's president.
 
 
 4
 On October 15, 1987, the Government brought the instant action against all of the above-captioned defendants, alleging numerous RICO violations at the Market. On April 15, 1988, the district court entered a consent judgment and a default judgment that together resolved the Government's claims against all of the non-union defendants. The two judgments permanently enjoined the Genovese Family and the named Family members and associates from dealing with Local 359 or any other union, from participating in any business or enterprise in the Market and from engaging in a wide range of racketeering activities. The Government subsequently withdrew its charges against all of the other named defendants except Local 359, Cirillo and Faicco, and the case against those defendants went to trial before Judge Griesa sitting without a jury.
 
 
 5
 The Government alleged in an amended complaint that Cirillo and Faicco engaged in a pattern of criminal acts in violation of RICO and asked that they be removed from their union offices and replaced by a trustee to run the union pending the election of new officers. The alleged predicate acts giving rise to the RICO claims included wire fraud, extortion and violations of the Taft-Hartley Act. The wire fraud claim was based primarily on telephone conversations between Cirillo and Vincent Romano in which the status of ongoing negotiations for a new collective bargaining agreement between Local 359 and Market employers was reported on and discussed. Romano was not a union member but was in fact an employer. Moreover, he relayed to Genovese hierarchy the information he received from Cirillo.
 
 
 6
 The district court stated that "as a matter of good judgment, Cirillo should not have been in touch with Romano about union matters." 705 F.Supp. at 904. However, the court found that neither Romano nor the Genovese Family directed or influenced Cirillo in the negotiations, id. at 904-05, that the information conveyed to Romano and the Family was not confidential, id. at 905, and that the union members were not disadvantaged as a result of the disclosed information. Id. at 902. These factual findings were not clearly erroneous and therefore must stand. Fed.R.Civ.P. 52(a); see Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985) (if district court's interpretation of the evidence is plausible, circuit court may not reverse even if it would have weighed the evidence differently). Accordingly, the district court's rejection of this wire fraud-RICO claim is affirmed. See United States v. Rastelli, 870 F.2d 822, 830-31 (2d Cir.1989).
 
 
 7
 The Government's remaining claim of wire fraud was based on Cirillo's alleged efforts to find a job at the Market for Steve Melfi, Carmine Romano's son-in-law, who was not a union member. The district court found "no evidence that Cirillo played any role whatever in obtaining the job for Melfi" and dismissed this claim. 705 F.Supp. at 906. We note in addition that Cirillo's unsuccessful attempt to obtain a job for Melfi did not threaten to deprive anyone of a property interest protected by the federal wire fraud statute. See McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We affirm this dismissal.
 
 
 8
 Because the district court's dismissal of the extortion claims also was based largely on factual findings that were not clearly erroneous, it too is affirmed.
 
 
 9
 The district court's dismissal of the Taft-Hartley-RICO claims, however, causes us concern. Indeed, we are sufficiently troubled by the district court's reasoning in dismissing these claims that we are remanding for reconsideration and a clearer exposition of the facts and the applicable law.
 
 
 10
 RICO provides, "It shall be unlawful ... to conduct ... [the] affairs [of any enterprise engaged in interstate or foreign commerce] through a pattern of racketeering activity...." 18 U.S.C. Sec. 1962(c). Both Local 359 and the Market qualify as enterprises under this section. See 705 F.Supp. at 897; United States v. LeRoy, 687 F.2d 610, 616 (2d Cir.1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); 18 U.S.C. Sec. 1961(4). A pattern of racketeering activity requires at least two interrelated criminal acts connected to conduct of the enterprise. "An interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir.1989) (en banc), cert. denied, --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). In addition, the relatedness and continuity necessary to show a pattern of racketeering acts may be established by relating two seemingly independent acts to the RICO enterprise. Id. at 1383.
 
 
 11
 In defining the relevant pattern of racketeering activity in paragraph 57 of its amended complaint, the Government alleged in substance that Cirillo and Faicco, officers of Local 359, and Vincent Romano, as de facto head of Local 359, "together with and/or aided and abetted by the Genovese Family" demanded and received money from Market employers and persons acting in the interests of those employers in violation of 29 U.S.C. Sec. 186(b)(1) (Taft-Hartley) and 18 U.S.C. Sec. 2 (aiding and abetting).
 
 Paragraph 57 concludes:
 
 12
 Defendants Anthony Cirillo and Dennis Faicco have each committed or aided and abetted two or more of these acts of illegal labor payments.
 
 
 13
 The testimony is clear that Local 359 received "dues" payments from a score of persons who were known to be either owners, managers or supervisors of businesses in the Market and who were not members of the bargaining unit represented by the Local. It seems clear to us that, if the receipt of such payments violated the Taft-Hartley Act, the Government established a pattern of unlawful activity under RICO. Moreover, whether we treat Local 359 or the Market as the pertinent enterprise, the existence of a relationship between the pattern and the enterprise hardly can be disputed.
 
 
 14
 The district court held, however, that, in order to establish a pattern of racketeering activity, the Government had to prove that Cirillo and Faicco committed their unlawful acts on behalf of the Genovese Family. 705 F.Supp. at 898. The district court stated that the Genovese Family's alleged control of the defendants was "the essential nexus which is said to make the crimes a 'pattern of racketeering activity' in violation of RICO, rather than several separate, independent criminal acts." Id. The court continued that "[t]he essential element of the Government's case is that the union and [Cirillo and Faicco] are tools of the Genovese crime family." Id. Specifically ruling on the alleged Taft-Hartley violations, the district court stated:
 
 
 15
 [T]he various issues of statutory interpretation, and the application of the statutory provisions to the facts of this case, involve a number of very doubtful points. However, one thing is not doubtful. It is perfectly clear that the presence of the 22 persons in question on the rolls of Local 359 had nothing whatever to do with organized crime or the Genovese crime family. Even if it was a violation of the Taft-Hartley Act to carry these persons as union members and to collect dues and pension and welfare contributions from them, there is no showing that this was anything other than a technical violation.... Thus, the Government has failed to make its case of criminal Taft-Hartley violations.
 
 
 16
 Id. at 908 (emphasis in original).
 
 
 17
 In making the foregoing statements, the district court may have been led astray by the Government's emphasis on Genovese Family participation in the acts giving rise to the wire fraud charges. We hold that Genovese involvement is irrelevant to the Taft-Hartley charges against Cirillo and Faicco. If Cirillo and Faicco committed multiple violations of the Taft-Hartley Act in conducting the union's affairs, they violated RICO whether or not the Genovese Family was involved. See United States v. LeRoy, supra, 687 F.2d at 616-17; United States v. Scotto, 641 F.2d 47, 54-55 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).
 
 
 18
 Insofar as the Taft-Hartley Act itself is concerned, it appears to us that the district court created doubt where none existed. In the first place, the district court's discussion of contributions to welfare and benefit funds in the above-quoted passage and elsewhere in its opinion is somewhat misleading, because such contributions, if any, are not at issue herein. The Government's complaint against the trustees (including Cirillo and Faicco) of the union's welfare and trust funds was dismissed by stipulation, and the Government does not argue the existence of Taft-Hartley wrongdoing with respect to such funds. See Government's Reply Brief at 10.
 
 
 19
 Section 302 of the Taft-Hartley Act, codified as 29 U.S.C. Sec. 186, provides in pertinent part:
 
 
 20
 (a) It shall be unlawful for any employer ... or any person who ... acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value--
 
 
 21
 * * *
 
 
 22
 (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; ...
 
 
 23
 * * *
 
 
 24
 (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
 
 
 25
 Despite the clarity of the foregoing provisions, the district court cited subsections 186(c)(4) and 186(d)(1) in support of its holding that, at best, the Government proved only a "technical" Taft-Hartley violation. Subsection 186(c)(4) provides in substance that the above-quoted provisions of subsections 186(a) and (b)(1) shall not be applicable "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization" provided the employer has received written assignments from the employees involved. Subsection 186(d)(1) provides that "[a]ny person who participates in a transaction involving a payment ... to a labor organization in payment of membership dues ... which transaction does not satisfy all the applicable requirements of subsection[ ] (c)(4) ... and willfully and with intent to benefit himself or to benefit other persons he knows are not permitted to receive [the] payment ... violates this subsection...." Relying on subsections 186(c)(4) and 186(d)(1), the district court held that "[t]he Government has made no showing that either Cirillo or Faicco acted willfully and 'with intent to benefit himself or to benefit other persons he knows are not permitted to receive a payment.' " 705 F.Supp. at 908.
 
 
 26
 We believe that the district court misinterpreted and misapplied the provisions of these latter two subsections. "Section generally prohibits payments from employers to unions, in order to prevent corruption, but Subsection (c)(4) makes an exception for dues deductions, provided that the employee gives voluntary written consent." NLRB v. Atlanta Printing Specialties and Paper Products Union, 523 F.2d 783, 786 (5th Cir.1975); see also Associated Builders & Contractors v. Carpenters Vacation and Holiday Trust Fund for Northern California, 700 F.2d 1269, 1276 (9th Cir.), cert. denied, 464 U.S. 825, 104 S.Ct. 94, 78 L.Ed.2d 101 (1983); NLRB v. Amax Coal Co., 453 U.S. 322, 328, 101 S.Ct. 2789, 2793, 69 L.Ed.2d 672 (1981) (discussing section 186(c)(5)); Local 50, Bakery and Confectionery Workers Union v. Local 3, Bakery and Confectionery Workers Union, 733 F.2d 229, 236 (2d Cir.1984) (same). Although appellees now euphemistically describe the questioned payments as "dues", the record does not support this assertion. The payments were not deducted from employees' wages and certainly not deducted pursuant to written assignments. Because such payments did not fall within the exception of subsection 186(c)(4), see Carroll v. American Federation of Musicians, 295 F.2d 484, 487 (2d Cir.1961), they likewise did not fall within the ameliorating provisions of subsection 186(d)(1). Furthermore, the statutory definition of "employee" in subsection 152(3) specifically excludes "any individual employed as a supervisor."
 
 
 27
 So that there will be no question about it on remand, we hold also that proof of a Taft-Hartley violation does not require a showing that the money unlawfully paid to Local 359 passed ultimately into the hands of the Genovese Family. See United States v. Scotto, supra, 641 F.2d at 54-55.
 
 CONCLUSION
 
 28
 Those portions of the district court's judgment that dismiss the Government's charges of wire fraud-RICO and extortion-RICO violations are affirmed. That portion of the district court's judgment dealing with alleged Taft-Hartley-RICO violations is remanded to the district court for reconsideration in accordance with the applicable principles of law described herein. In directing such reconsideration, we do not pass upon the ultimate question whether the injunctive relief requested by the Government should be granted. Moreover, because we are satisfied that Judge Griesa will handle this matter on remand in accordance with the highest judicial standards, we deny the Government's request that the case be remanded to a different judge.