**John CONTEH, Movant,**

**v.**

**UNITED STATES of America, Respondent.**

**Nos. 02 Civ. 1471(LAK), 98 Crim. 876(LAK).**

United States District Court, S.D. New York.

Oct. 7, 2002.

John Conteh, Movant pro se.

Aitan Goelman, Asst. U.S. Atty., James B. Comey, U.S. Atty., New York City, for Respondent.

## MEMORANDUM OPINION

KAPLAN, District Judge.

John Conteh was convicted in 1999 of conspiracy, in violation of 18 U.S.C. § 371, to commit bank fraud and to possess a counterfeit security and of making false statements to a federal law enforcement agent, in violation of 18 U.S.C. § 1001, and sentenced principally to a term of imprisonment of one year and one day followed by three years of supervised release.[1] His conviction was affirmed by the Court of Appeals.[2] Conteh's motion for a new trial on the ground of allegedly newly discovered evidence was denied by this Court, and the Court of Appeals recently dismissed his appeal from that order on the ground of untimeliness.

Now before the Court is Conteh's *pro se* motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct his sentence. Conteh assigns six grounds for relief:

1. The conviction was obtained in violation of Conteh's privilege against self-incrimination.

2. The conviction was obtained pursuant to an unlawful arrest and/or an unconstitutional search and seizure.

3. The Court erred in receiving evidence of conversations between Ebou (Ibrahima Koita) and Jean–Jacques because the conspiracy of which plaintiff allegedly was a member had terminated by the time of the conversation.

1. According to Conteh's reply papers, he has served his prison term but now is in the custody of the Immigration and Naturalization Service.

2. *United States v. Conteh,* 2 Fed. Appx. 202 (2d Cir.2001).

4. The conviction was obtained as a result of false testimony submitted by the government.

5. The government violated Conteh's *Brady* rights by failing to disclose evidence favorable to him.

6. Plaintiff was deprived of the effective assistance of counsel because his attorney at trial (a) was "acting in the capacity for Kings County" and thus had a conflict of interest, (b) failed to investigate information about alleged meetings and conversations between Conteh and an FBI agent before July 10, 1997, and (c) failed to argue the venue issue.

These contentions are disposed of as follows:

### I.  Self–Incrimination
#### A.  The Pertinent Evidence at Trial

In order to discern precisely what movant is complaining about, some background is necessary. The first of the counts of conviction was Count One of the Indictment, which charged a conspiracy among Conteh, Ibrahima Koita a/k/a Ebou, and others to commit bank fraud in violation of 18 U.S.C. §§ 513(a) and 1344. The overt acts alleged included deposits of counterfeit checks to accounts at a Dime Savings Bank ("Dime") branch in Brooklyn and a Chase Manhattan Bank branch in Manhattan and subsequent withdrawals of the proceeds.[3] Count Four, the other count on which Conteh was convicted, charged Conteh with falsely stating to an FBI agent, on or about July 16, 1997, that Conteh never had seen a counterfeit check deposited into a bank account in his name.

Perhaps the critical evidence on the false statement count was the fact that the check bore a fingerprint or fingerprints belonging to Conteh, which was determined by a comparison between the print or prints on the check and a set of Conteh's prints which, the government asserted, were obtained by the FBI on July 16, 1997. The thrust of Conteh's position on this point is that the prints the government obtained from him were secured in violation of his privilege against self-incrimination and his *Miranda* rights.

The government's proof at trial showed that FBI agent Rothe learned of Conteh's possible involvement with a counterfeit check in the amount of $25,200 deposited to Conteh's account at Dime, the original of which was received in evidence as Government Exhibit (GX) 15. On July 10, 1997, Rothe interviewed Conteh in the agent's car about the deposit to his account. Conteh said he first learned of such a check when he saw an unexpectedly large balance in his account and that he suspected his girlfriend of having made the deposit. Rothe then showed him a photocopy of GX 15 and asked him, among other things, whether he ever had seen GX 15 before and whether the endorsement was his signature. Conteh said he never had seen the check and that the signature was not his.

Four days later, on July 14, 1997, according to Rothe, he returned and questioned Conteh further concerning his explanation of how the money wound up in his Dime account. On that occasion, Agent Rothe again showed Conteh a copy of the check, and Conteh again denied ever having seen it. Rothe asked Conteh to come to the FBI office to supply fingerprints, which Conteh did on July 16, 1997, at which time Rothe exhibited the original check, encased in plastic, to him. In due course, comparison demonstrated that Conteh's fingerprints matched a fingerprint or prints on GX 15. Conteh was arrested and prosecuted. At no point dur-

---

**3.** Conteh was acquitted on Counts Two and Three, which were substantive counts involv-
ing the Chase deposit and withdrawals charged as overt acts in Count One.

ing or prior to the trial did Conteh seriously challenge Agent Rothe's testimony or offer any evidence of his own concerning how his fingerprints got on the check or how the FBI obtained the prints it used for comparison purposes.

## B. Conteh's Contentions

Conteh now claims that July 10, 1997 was not the first time he saw Agent Rothe or, if not Agent Rothe, another FBI agent. He asserts that there were prior encounters during which the FBI sought to enlist Conteh as a cooperator. When he refused, he claims, Rothe or another agent searched and took documents from him, warned Conteh not to talk to his attorney about what happened, and said that the agent would arrest him and hand him over to the INS for deportation if he told anyone about the incident. He contends also that Agent Rothe misled the Court by suggesting at trial that he saw Conteh only on July 10, 14 and 16, 1997.

Construing Conteh's papers generously, he appears to be suggesting that he would not have spoken to Agent Rothe at all on the latter dates, much less made the false statement for which he was convicted on Count Four, but for the fear engendered by the alleged prior incident or incidents with the FBI. Although he does not so formulate the argument, he appears to be suggesting that he was in custody when he made the alleged false statement—perhaps a custodial status to be inferred from the facts that the statements were made at the

FBI office where he had been asked to report, that he was threatened by an FBI agent prior to his asylum interview, and that he feared deportation—and that his *Miranda* rights were violated at the time the statement at issue on Count Four was obtained. He thus implies that the statement should have been suppressed.

■ Even assuming that Conteh's factual contentions were accepted and, for that matter, that the statement in question was made while he was in custody,[4] this is an argument that should have been raised prior to trial by a motion to suppress the July 16, 1997 statement. The failure thus to raise it waived the argument.[5] In consequence, the issue is available to him only if there was cause for his procedural default and prejudice arising therefrom.[6]

■ Conteh argues that his trial attorney "failed to investigate information and statement about prior meetings and conversations with agent before July 10, 1997,"[7] thus perhaps implying that counsel's alleged failure was a cause of the procedural default.[8] But there is no claim that Conteh told his attorney about these alleged events *until after he was convicted*. Indeed, he states elsewhere in his papers that, following the guilty verdict, he obtained telephone records supposedly showing some prior contact and gave them to his attorney, but that the attorney told him that it was too late because the trial was over.[9] As there is no evidence that Conteh told his trial counsel about these

---

4. This is an extremely doubtful proposition.

5. *See* FED. R.CRIM. P. 12(b)(3), 12(f); *United States v. Frady*, 456 U.S. 152, 166–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Davis v. United States*, 411 U.S. 233, 242, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973).

6. *E.g., Frady*, 456 U.S. at 167–68, 102 S.Ct. 1584.

7. Conteh Mem. 14.

8. "Ineffective assistance will constitute cause when it rises to a constitutional violation of a petitioner's Sixth Amendment right to have the effective assistance of counsel for his defense." *Bloomer v. United States*, 162 F.3d 187, 191 n. 1 (2d Cir.1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 755, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)).

9. Conteh Mem. 2–3.

alleged events prior to the end of the trial, it certainly cannot be said that trial counsel rendered ineffective assistance by failing to move to suppress the statement that was the basis of the Section 1001 count.[10]

## II. Search and Seizure—The Fingerprint Evidence

Conteh now seeks to challenge the government's use of the fingerprints it obtained from him when he reported to the FBI office in response to Agent Rothe's request and thus attacks his conviction on Count One.[11] Although there is some quibble about whether the office to which he reported was at 26 Federal Plaza or at 7 World Trade Center, the thrust of the argument appears to be that the fingerprints were obtained illegally because they were the product of the earlier threat, or, as his reply memorandum suggests, of an "arrest" that took place prior to July 10, 1997.

For the reasons set forth above, this claim was waived by Conteh's failure to move to suppress the fingerprints prior to trial. Nor has Conteh even remotely addressed the issue of cause for the procedural default, as there is no claim of ineffective assistance of counsel relating to this issue. Even if there were, there is no evidence that Conteh told his lawyer anything about the alleged threat or other misbehavior by the FBI prior to July 10, 1997, so counsel's failure to seek to suppress the fingerprints on the ground that they were coerced and obtained in violation of Conteh's *Miranda* rights cannot be faulted.

## III. The Conversations Between Ebou and Jean–Jacques

The government offered, and the Court received, evidence of three telephone conversations between Ebou and Jean–Jacques,[12] conversations that Conteh argues should have been excluded because they occurred after termination of the alleged conspiracy. He contends that the conviction on Count One consequently should be vacated on the theory that the only proof linking Conteh to a conspiracy relating to the Chase Manhattan deposit, the making of which was the overt act in the Southern District of New York and thus essential to establish venue, were these conversations.[13]

■ The first problem with the argument is that the tapes were received without objection.[14] In consequence, any issue as to admissibility was waived absent satisfaction of the cause and prejudice test. In this instance too, moreover, Conteh has failed to establish cause for the procedural default. It was far from apparent that the tapes were offered for any hearsay purpose, as they were relevant to establishing the existence of a relationship between Ebou and Jean–Jacques, two of the alleged conspirators, a purpose quite independent of the truth of the statements made in the conversations. Given the existence of an appropriate, non-hearsay purpose for the conversations, there probably was no basis upon which counsel properly could have objected. And even if there were some bit of content in the conversations that was relevant for its truth, counsel's failure to seek a limiting instruction would have been a reasonable tactical decision in light of the fact that such an instruction would have

---

**10.** *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**11.** Conteh Mem. 4.

**12.** GX 12–14 (tapes); *see also* GX 21–23 (transcripts).

**13.** Conteh Mem. 5–7.

**14.** Tr. 27.

risked drawing the jury's attention to any such material, something that counsel was entitled to regard as against Conteh's interests.

■ As the Supreme Court made clear in *Strickland,* "[j]udicial scrutiny of counsel's performance must be highly deferential." [15] It must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " [16] In view of the lack of any proper basis for objecting to the tapes in their entirety, the dubious basis for seeking a limiting instruction, and the risk that a limiting instruction would have focused the jury on the fleeting and ambiguous references to Conteh that otherwise might well have been disregarded, Conteh has failed to overcome this presumption.

In any case, even if there were cause for the procedural default, there was no prejudice. Conteh's premise here is that the only evidence linking him to the Chase Manhattan Bank account, the account from which withdrawals were made in Manhattan, was the taped conversations. But he is quite wrong. The trial testimony of Jean Jean–Jacques laid out in detail that Conteh was the instigator of the scheme to defraud Chase Manhattan, that he met with Conteh and Ebou in Manhattan near the bank several times in connection with withdrawing funds, that he withdrew funds there, and that he shared the proceeds in Manhattan with Conteh. In

light of this evidence, the brief references to "John" in the taped conversations surely were harmless, even assuming that they were received, or received without a limiting instruction, in error. Indeed, the only reference the government made to the taped conversations during summation was to point out that Jean–Jacques' trial testimony was corroborated, among other things, by the simple facts that the name "John" was mentioned during the conversations and that the only "John" known to both Ebou and Jean–Jacques was Conteh.[17]

## IV. The False Testimony Argument

The fourth ground set forth in the motion, as amplified by Conteh's reply papers, to the extent it is comprehensible and something other than a rehash of the first, is a contention that Agent Rothe lied when he said at trial that he (1) spoke to Conteh for the first time on July 10, 1997, and (2) showed Conteh a photocopy, as opposed to the original, of the check on July 14, 1997.

■ A Section 2255 motion is not a vehicle for rearguing the credibility of witnesses. "Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury" at the time of trial.[18] If the defendant demonstrates that the prosecution knew or should have known of the perjury, then the court will set aside the conviction " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " [19] If, however, the

---

**15.** *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

**16.** *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

**17.** Tr. 338.

**18.** *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991).

**19.** *Id.* (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *see also United States v. Helmsley,* 985 F.2d 1202, 1205–06 (2d Cir.1993).

government is not shown to have been aware of the perjury, a new trial is warranted only if (1) the testimony was material, and (2) " 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.' " [20] Thus, the Court must determine whether there was false testimony, whether the government knew or should have known of its falsity, and, finally, how material the perjury was to the movant's convictions. Further, a defendant seeking relief on the ground of the government's use of perjured testimony must demonstrate that he was unaware, and with due diligence would have remained unaware, of the falsity of the testimony.[21]

### A.  Whether Agent Rothe Spoke to Conteh Prior to July 10, 1997

Agent Rothe described three interviews with Conteh commencing on July 10 and, on cross-examination, unequivocally stated that his first conversation with him was on July 10, 1997.[22] In consequence, there is a flat contradiction between that testimony and the story Conteh now tells on this motion. Acceptance of Conteh's account therefore would establish the falsity of Rothe's testimony on this point and, the Court assumes from his status as an FBI agent, establish also that the government

knew of the falsity of his testimony at the time of the trial. But there are two fundamental obstacles to Conteh's application for relief.

First, Conteh was well aware of his meetings with the FBI. Hence, if Agent Rothe actually did testify falsely, Conteh knew it the moment it occurred. Having failed to cross-examine the agent or to offer any evidence on the point, he cannot be allowed to raise the issue now.

█ Second, even if the testimony was inaccurate, it is perfectly plain, given the way the evidence came in at trial, that the question of whether Agent Rothe first spoke to Conteh on July 10 or some earlier date was utterly immaterial. This bore on none of the key points of his testimony, including proof of Conteh's denial, on July 16, 1997, that he ever had seen GX 15 before, Conteh's behavior at the time of his arrest (he hid in a closet), and the manner in which the investigation led first to Jean–Jacques and, through him, to Conteh.

To be sure, Conteh takes a very different view, making a "for want of a nail, the kingdom was lost" sort of argument. His premise is that if Agent Rothe had told what Conteh says is the truth—viz., that the July 10, 1997 interview was not the first conversation he had had with Conteh—the government's case would have

---

**20.** *Wallach,* 935 F.2d at 456 (quoting *Sanders v. Sullivan,* 863 F.2d 218, 226 (2d Cir.1988)); *see also United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir.1975) (stating test as "whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction.").

**21.** *See United States v. Zichettello,* 208 F.3d 72, 102 (2d Cir.2000), *cert. denied sub nom. Lysaght v. United States,* 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001) (reversal based on use of perjured testimony "not justified unless the appellant establishes ... (i) the witness actually committed perjury ...; (ii)

the alleged perjury was material ...; (iii) the government knew or should have known of the alleged perjury at the time of trial . . .; and (iv) the 'perjured testimony remained undisclosed during trial ...' ") (quoting *United States v. Blair,* 958 F.2d 26, 29 (2d Cir.1992)); *United States v. Helmsley,* 985 F.2d 1202, 1205–08 (2d Cir.1993) (collateral attack based on the government's use of perjured testimony, the falsity of which was known by the defendant or knowable by the defendant had he used due diligence will be entertained "only where the prosecutor was directly involved in the falsity").

**22.** Tr. 66.

unraveled because the alleged threat to Conteh would have been revealed. But the conclusion simply does not follow from the premise. Agent Rothe never was asked about the content of any prior conversations with Conteh, about any threats, or about anything else related to Conteh's present theory—quite obviously because Conteh did not tell his lawyer the story he now tells or, if he did, because the lawyer concluded that there was nothing to be made of it, at least without Conteh taking the stand, which he did not do. In consequence, even if Agent Rothe had responded "truthfully," by Conteh's lights, to the questions he was asked, the jury would have heard no more than that July 10, 1997 was not the first time he spoke with Conteh—a fact of utter insignificance.

### B. When Did Agent Rothe Hand Conteh the Original Check?

Agent Rothe testified at trial that he showed Conteh a photocopy of the check on July 10 and again on July 14, 1997 and that the original check remained encased in plastic at all times when he exhibited the original to Conteh on July 16, 1997.[23] Thus, according to the government, the only explanation for the presence of Conteh's fingerprints on the check was that the check had been in his hands before it came into FBI custody. Conteh attacks this testimony as perjurious, arguing that Agent Rothe's "statement to the court to obtain a warrant,"[24] also described as his "affidavit" but in any case clearly a reference to the complaint in this case,[25] is inconsistent with his trial testimony on this point.[26]

Again, there are two basic problems with Conteh's argument. He was well aware at trial of the evidence upon which he now relies. He certainly knew when he handled the check, and he had, or had access to, the complaint sworn out by the agent. So he will not be heard to attack the agent's testimony on this issue in this collateral proceeding.

Even if Conteh might be heard to mount this argument now, it would fail on the merits because there was no inconsistency in the agent's testimony. Agent Rothe's grand jury testimony, which was given on August 10, 1998, is to precisely the same effect as his trial testimony.[27] While the sworn complaint, which resulted in the issuance of the warrant for Conteh's arrest, stated more generally that Rothe showed Conteh "the check" on July 14, 1997,[28] Rothe did not there say that he showed Conteh, much less allowed him to handle, the original on that occasion. Thus, there is no inconsistency between the complaint and Rothe's trial testimony, much less a *prima facie* showing that Rothe perjured himself at trial when he testified that the document he showed Conteh on July 14 was a photocopy of the check.

### V. The Brady–Giglio Argument

Conteh argues that the government failed to "disclose statements and conversation between the defendant and the FBI agent that investigated the case.... Instead, they only provided evidence that reflect the prosecution false *three day theory.*"[29] While it is none too clear, the point presumably is that disclosure of such information would have facilitated a motion

---

23. Tr. 43, 49–54.

24. Conteh Reply 9.

25. There is no other affidavit of which the Court is aware.

26. *Id.*

27. Grand jury minutes, Aug. 11, 1998, 9, 11–12.

28. Cpt ¶ 16.

29. Conteh Mem. 11 (emphasis in original).

to suppress the false statement of July 16, 1997 and thus precluded conviction on Count Four.[30]

In order to establish a *Brady* violation, the defendant must show that (1) the government suppressed favorable evidence, and (2) the evidence suppressed was material.[31] "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [32]

A defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." [33] Conteh was fully aware of any conversations he had with the FBI prior to July 10, 1997. He thus knew "the essential facts" that would have permitted him to prove the existence of such conversations at to have argued their significance. Hence, any failure by the government to disclose its knowledge of any such conversations did not constitute suppression. There was no *Brady–Giglio* violation.

### VI. *Ineffective Assistance of Counsel*

Conteh makes two ineffective assistance arguments not already disposed of, viz. that (1) his attorney "was acting in the capacity as attorney for Kings County" and thus had a conflict of interest, and (2) counsel failed to argue, in support of his Rule 29 motion at the close of the evidence, that venue was improper.

Conteh of course had a right to representation by counsel owing a duty of loyalty only to him. He has failed, however, to adduce any evidence suggesting that any representation of Kings County by his trial counsel might have affected the vigor and competence with which he represented Conteh. The argument is entirely frivolous.

Conteh's trial counsel, as he argues, did not argue improper venue as a ground for relief under Rule 29. He nevertheless did raise the issue on appeal. While the Second Circuit held that the failure waived the issue, it went on to rule, in the alternative, that "the evidence presented by the government regarding venue was sufficient to support the jury's verdict." [34] In consequence, Conteh was not prejudiced by the failure and therefore cannot prevail on this ineffective assistance claim even if counsel's failure fell below the requisite standard of competence, a point as to which the Court need not express an opinion.

### *Conclusion*

For the foregoing reasons, Conteh's motion for relief under 28 U.S.C. § 2255 is denied in all respects. As Conteh has raised no substantial question, a certificate of appealability is denied. The Court determines that any appeal here from would not be taken in good faith within the meaning of 28 U.S.C. § 1915.

SO ORDERED.

---

**30.** Conteh states also that a result favorable to him on this point would require vacatur of the conviction on Count One. The Court is at a loss to understand why that would be so.

**31.** *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995)

**32.** *United States v. Avellino,* 136 F.3d 249, 256 (2d Cir.1998).

**33.** *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982), *cert. denied.* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

**34.** 2 Fed. Appx. at 204.